## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

DISTRICT 4 LODGE OF THE )
INTERNATIONAL  ASSOCATION OF )
MACHINISTS AND AEROSPACE )
WORKERS, LOCAL LODGE 207, )
*f/k/a*, IAMAW MAINE LOBSTERING )
UNION – LOCAL 207, )
)
DAMON FAMILY LOBSTER CO., INC., )
)
FOX ISLAND LOBSTER COMPANY, LLC, )        Docket No.
and )
)        **Emergency Injunctive Relief**
FRANK THOMPSON, )        **Requested**
)
Plaintiffs, )
)
v. )
)
GINA M. RAIMONDO, *in her official capacity* )
*as Secretary*, United States Department )
of Commerce, )
)
JANET COIT, *in her official capacity as* )
*Assistant Administrator,* NOAA Fisheries, and )
)
NATIONAL MARINE FISHERIES SERVICE, )
)
Defendants, )
_____)

## COMPLAINT FOR EXPEDITED DECLARATORY AND INJUNCTIVE RELIEF

**NOW COMES,** Plaintiffs District 4 Lodge of the International Association of Machinist

and Aerospace Workers, Local Lodge 207, *f/k/a* IAMAW Maine Lobstering Union – Local 207

(the "MLU"), Damon Family Lobster Company, Inc., Fox Island Lobster Company, LLC, and

Frank Thompson (collectively, the "Plaintiffs"), by and through their undersigned attorneys, and

hereby file this Complaint for Expedited Declaratory and Injunctive Relief against Gina M.

Raimondo, in her official capacity as Secretary of the United States Department of Commerce,

Janet Coit, in her official capacity as Assistant Administrator of the National Oceanic and

Atmospheric Administration Fisheries ("NOAA Fisheries"), and the National Marine Fisheries Service ("NMFS") (collectively, the "Defendants").

## INTRODUCTION

1.      The North Atlantic right whale has been listed as an endangered species under the Endangered Species Act ("ESA") since 1973.  The plight of the North Atlantic right whale has been the subject of considerable litigation, but unlike those cases, this matter arises solely under the Administrative Procedures Act ("APA") as a challenge to a final rule that implements a seasonal closure to lobster fishing using vertical buoy ropes in certain federal waters off the coast of Maine between October and January.

2.      North Atlantic right whale sightings in the Gulf of Maine are extremely rare. Between 2013 and 2017, very few right whales were sighted in the Gulf of Maine:

**Approximate Range (Shaded Area) and Distribution of Sightings (Dots) of Known North Atlantic Right Whales 2014-2018**



North Atlantic Right Whale

*See* 2020 NOAA Marine Mammal Stock Assessment Report, Right Whale, North Atlantic at 1,

*available at* https://media.fisheries.noaa.gov/2021-07/f2020_AtlGmexSARs_RightWhale.pdf?null (last visited Sept. 23, 2021).

3.    Since 2010, North Atlantic right whales have increasingly left the Gulf of Maine for Canadian waters as their primary food source shifts towards colder waters.  Because the Gulf of Maine continues to warm 99% faster than the rest of the world's oceans, the risk of co-occurrence between right whales and fishing gear in waters off the coast of Maine is steadily decreasing.  *See* NOAA Tech Memo NMFS NE. 247 at 10, *available at* https://downloads.regulations.gov/USCG-2019-0131-0039/attachment_2.pdf (last visited Sept. 24, 2021).

4.    As the Gulf of Maine warms and North Atlantic right whales shift their habitat to Canadian waters, right whale sightings have become even less frequent.  The map below indicates all North Atlantic right whale sightings between August 25, 2020 and September 15, 2021, with definite visual sightings in gray, definite acoustic sightings in red, and possible acoustic detections in yellow:



*See  https://apps-nefsc.fisheries.noaa.gov/psb/surveys/MapperiframeWithText.html* (last visited

September 8, 2021).

5.      Despite the fact that North Atlantic right whales are rarely, if ever, detected in the Gulf of Maine, on August 31, 2021, NMFS announced a final rule that, *inter alia*, implemented an annual season closure of 967 square miles of lobster fishing grounds in federal waters, located approximately 30 miles off the coast of Maine, to lobster fishing by means of vertical buoy ropes (the only currently feasible method of landing lobster) between October and January in order to reduce the risk of entanglement to the North Atlantic right whale (the "LMA 1 Restricted Area"):



6.      The stated purpose of the LMA 1 Restricted Area is to spread the burden of risk reduction across all affected jurisdictions and to promote experimentation with "ropeless" fishing gear.  Lobster fishing, however, is a much larger and more critical part of the State of Maine's economy than those of other northeast states, and NMFS itself concedes, that "ropeless" fishing (whereby fishermen retrieve their gear from the sea floor by remotely inflating a bag that brings the trap and groundline to the surface) has a number of "technological, regulatory, financial, and

operational barriers" that do not allow "ropeless" fishing to be a viable alternative to fishing with buoy lines. *See Exhibit D* at 102-104.

7.      With this Complaint, the Plaintiffs now challenges the LMA 1 Restricted Area as arbitrary and capricious based on the Defendants' own scientific data and findings, and for failing to take into account the lack of data and flawed assumptions underlying those findings, in determining that a blanket seasonal closure of an area within LMA 1 without any triggering events or analysis of the effectiveness of NMFS' other existing right whale regulations is necessary to achieve a 60% reduction in right whale entanglements in all United States waters.

## THE PARTIES

8.      Plaintiff MLU is Local Lodge 207 within District Lodge 4 of the International Association of Machinists and Aerospace Workers ("IAMAW") with its principal place of business in the District of Maine.  The MLU was incorporated by the State of Maine on September 10, 2013 as a nonprofit fish marketing association pursuant to the State of Maine's Fish Marketing Act, 13 M.R.S.A. §§ 2001 *et seq.*  The MLU is comprised of approximately 200 members, all of whom are full members of the IAMAW (District 4) and hold active Maine commercial lobster and crab fishing licenses, together with the sternmen and women who work for them.

9.      Plaintiff Damon Family Lobster Company, Inc. ("Damon Family Lobster") is a family-owned company with its principal place of business in Stonington, Maine.  Damon Family Lobster is engaged in the wholesale and retail sale of Maine lobster and has eleven employees.

10.     Plaintiff Fox Island Lobster Company, LLC ("FILCO") is a family-owned Maine limited liability company with its principal place of business in Vinalhaven, Maine.  FILCO purchases lobster from Vinalhaven fishermen and sells that lobster at wholesale.  FILCO has 12 employees and purchases lobster from between 50 and 60 boats in the Vinalhaven area.

11.     Plaintiff Frank Thompson is an individual residing in Vinalhaven, Maine and the

co-owner with his wife Jean of FILCO.  Mr. Thompson is a member of the MLU and fishes 400 traps in the LMA 1 Restricted Area between October and June.  The Thompsons are six-generation fishermen, and Mr. Thompson has been lobstering for 55 years.

12.     Defendant Gina M. Raimondo is the Secretary of the United States Department of Commerce and is named as a Defendant by virtue of her official capacity.  Secretary Raimondo ("the Secretary") supervises and directs all business conducted by the Department of Commerce and is responsible under federal law for ensuring that the actions, decisions and rules of the Department of Commerce comply with all applicable laws, including the APA.

13.     Defendant Janet Coit is the Assistant Administrator of NOAA Fisheries and is sued in her official capacity.  Assistant Administrator Coit has the responsibility for implementing and enforcing NOAA Fisheries' duties under the APA.

14.     Defendant NMFS is an agency within NOAA to which the Secretary of Commerce has delegated the authority to administer rules and regulations concerning fisheries in United States waters.

## JURISDICTION AND STANDING

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action presents a federal question arising under the laws of the United States, specifically the APA, ESA and MMPA.  An actual, justiciable controversy exists between the Plaintiff and the Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C §§ 701-706.

16.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the Plaintiffs' principal places of business are in this District, all of the members of the MLU reside in this District and hold licenses issued in this District, and a substantial part of the events or omissions giving rise to the Plaintiffs' claim occurred, or a substantial part of property that is the subject of the

action is situated, in this District.

17.     The MLU is an association of persons with related interests in this District.  Of the MLU's approximately 200 members, approximately 45 lobster in the LMA 1 Restricted Area.  The MLU also has many members in Stonington and Vinalhaven, the two largest American lobster landing ports in the United States and the main ports that would be affected by the LMA 1 Restricted Area.

18.     The interests that the MLU seeks to protect are germane to its purpose, which is to promote the interests of licensed Maine lobstermen and women.  Mindful that the livelihoods of its members depend on their responsible stewardship of the Gulf of Maine's marine resources, the MLU works closely with NMFS, the Maine Department of Marine Resources, and other industry regulators and conservation groups to promote policies and regulations that ensure that the harvest of Maine lobster is done in a manner that is sustainable and safe for both Maine's lobstermen and women and all wildlife that occupy and rely upon the fishery.  Neither the claims asserted nor the relief requested requires that an individual member of the association participate in the lawsuit because all individual MLU members hold the same licenses and operate within the same regulatory framework.

19.     The MLU and its members also wholly own Lobster 207, LLC, a Maine limited liability company with its principal place of business in Trenton, Maine that operates a wholesale and retail business ("Lobster 207") that markets and sells Maine lobsters and crabs harvested by MLU members and other holders of Maine lobster and crab fishing licenses.  Lobster 207 stands to lose about 4 million pounds of lobster for every season the LMA 1 Restricted Area remains in place, which could put the company out of business.

20.     The Damon family has owned and operated Damon Family Lobster in Stonington for the last 12 years.  Damon Family Lobster presently sells approximately 4 million pounds of

lobster annually.    Approximately 1-1.3 million pounds of that volume comes from the LMA 1 Restricted Area between October and January, meaning a complete closure of the LMA 1 Restricted Areas during its most productive season would have a detrimental and irreversible impact on the Company's operations and financial viability.

21.    FILCO has been in operation since 2012 and presently purchases approximately 1-1.2 million pounds of lobster between October and January of each year, most of which comes from the LMA 1 Restricted Area.  In the event the LMA 1 Restricted Area is implemented, FILCO would stand to lose approximately $5 million in revenue in addition to a loss of boats due to gear conflicts.  A complete closure of the LMA 1 Restricted Areas during its most productive season would have a devastating impact on FILCO's operations and financial viability.

22.    Frank Thompson fishes 400 traps in the LMA 1 Restricted Area between October and June of each year.  In his 55 years as a lobsterman, Mr. Thompson has never observed a right whale.  Approximately half of his income would be lost as a result of the LMA 1 Restricted Area.  Moreover, if Mr. Thompson cannot lobster in the LMA 1 Restricted Area, he will be forced to fish further north in far more dangerous conditions approximately 5 hours from shore in order to avoid gear conflicts with other lobstermen fishing near the LMA 1 Restricted Area.

23.    The LMA 1 Restricted Area is expected to cause gear conflicts among approximately 500 lobster boats and their employees and the largest "trap war" the State of Maine has ever seen.  These gear conflicts will likely upset the traditional supply to various wholesale dealers, resulting in a reconfiguration of the entire fishery.

### LEGAL BACKGROUND

24.    Section 9 of the ESA prohibits the "taking" – generally defined as the harming, harassing or killing – of any endangered or threatened listed species. 16 U.S.C. §§ 1532(19), 1538. The North Atlantic right whale has been listed as an endangered species under the ESA since 1973.

25.     Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ."  16 U.S.C. § 1536(a)(2).  If a proposed federal agency action "is likely to adversely affect" an ESA listed species, the agency must consult with the NMFS and obtain a so-called "biological opinion" as to whether the proposed action is likely to jeopardize the continued existence of the species.  50 C.F.R. §§ 402.14.  If a Section 7 ESA consultation results in a biological opinion that finds a proposed agency action is not likely to jeopardize the continued existence of the species, but may likely result in the incidental take of an individual member of the species, NMFS must provide an incidental take statement ("ITS") along with its biological opinion on the proposed action.  16 U.S.C. § 1536(b)(4)(i)-(ii) & (o)(2).

26.     The Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361 *et seq.*, prohibits the "taking" of any marine mammal, whether or not that marine mammal is listed as endangered or threatened under the ESA.  *See* 16 U.S.C. § 1371(a).  "[T]he incidental taking of marine mammals in the course of commercial fishing operations," however, is an exception to this general prohibition, so long as any incidental (unintentional) taking is authorized.  *See* 16 U.S.C. § 1387(a)(1).  In the case of ESA-listed marine mammals, an incidental take authorization requires a take reduction and recovery plan ("TRP") and an ITS that concludes that any such take "will have a negligible impact on such species," meaning that the take will not exceed the potential biological removal ("PBR") threshold necessary to sustain the species.  *See* 16 U.S.C. § 1371(a)(5)(E).

27.     NMFS first convened an Atlantic Large Whale Take Reduction Team ("ALWTRT") in 1996 to recommend an Atlantic Large Whale Take Reduction Plan ("ALWTRP") containing regulatory measures to reduce the occurrence of mortality and serious injury to North

Atlantic right whales. NMFS adopted the ALWTRP in 1997. The MMPA requires NMFS to amend the ALWTRP as necessary to meet the requirements of the MMPA. 16 U.S.C. § 1387(f)(7)(F).

28.     The APA governs judicial review of final agency actions. Under the APA, courts must "hold unlawful and set aside agency action, findings, or conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

## FACTUAL BACKGROUND

### *The North Atlantic Right Whale*

29.     In 1990, NMFS estimated that approximately 270 North Atlantic right whales were in existence. NMFS estimates that there are approximately 368 individual North Atlantic right whales in existence today, and calving rates appear to be improving: in 2017, 5 new calves were documented, with zero documented in 2018 and 7 documented in 2019. In 2020, however, 10 calves were documented, and 17 calves were documented during the 2021 season as of March 29th.[1]

30.     Traditionally, North Atlantic right whales are found primarily in the western North Atlantic Ocean, though recently there have been detections and/or sightings of North Atlantic right whales in waters off Greenland, Newfoundland, northern Norway, and Iceland. North Atlantic right whales typically migrate from feeding grounds in the Northeast to their calving grounds off the Southeast Coast of the United States in the late fall, where they spend the winter and spring.

31.     The North Atlantic right whale's feeding grounds have shifted in recent years, with more right whales being observed in Cape Cod Bay; the Gulf of Saint Lawrence; the mid-Atlantic; and south of Nantucket, Massachusetts due to shifts in copepod (the right whales' primary source

---

[1] Scientists typically distinguish individual North Atlantic right whales by their callosities (raised patches of rough skin on their heads), which are unique to each individual and are visible from boats or airplane surveys.

of food) distribution as a result of climate change.

32.     In comparison to recent decades, right whales now spend significantly more time in more northern waters and swim first through extensive pot fishery zones near Nova Scotia and then into the Canadian Gulf of St. Lawrence. *See 2021 NMFS Biological Opinion* at 215, attached hereto as Exhibit A.

33.     Since 2010, the occurrence of North Atlantic right whales in the Gulf of Maine has steadily declined due to a shift in copepod distribution caused by an increase in the Gulf of Maine's water temperature, which is warming faster than 99.9% of the world's oceans.

34.     There are two major known causes of serious injury and mortality to North Atlantic right whales: vessel strikes and entanglement in fishing gear.  Although right whales occasionally may drown, become injured or starve when they become entangled in fishing gear, entanglement does not necessarily result in serious injury or mortality.

35.      According to NMFS, "there is very little evidence of natural mortality in adult whales," and "there has been no confirmed case of natural mortality in adult right whales in the past several decades." *See* NOAA Tech Memo NMFS NE. 247 at 10-11, *available at* https://downloads.regulations.gov/USCG-2019-0131-0039/attachment_2.pdf (last visited Sept. 24, 2021).

36.     The vertical and ground lines of several different fisheries – including the red crab, monkfish, bluefish, flounder, scup, black sea bass and Canadian stone crab fisheries – have been found to entangle ESA-listed species, including North Atlantic right whales.  In many instances, entanglements have been the product of more than one set of pot gear. Accordingly, a North Atlantic right whale may be entangled in the line of one set, which then becomes tangled with the bottom gear or vertical line of a second or third set of gear.

### *The American Lobster Fishery*

37.     The American Lobster fishery, which is subject to the ALWTRP because it is considered a "Category 1 fishery" that NMFS deems to have the potential to cause serious injury or mortality to the North Atlantic right whale, is one of the most valuable fisheries on the Atlantic coast.  In 2016 alone, approximately 159 million pounds of lobster were landed in the fishery, over 97% of which were landed in the Gulf of Maine and Georges Bank (far offshore between Massachusetts and Nova Scotia).

38.     In 2018, 121.3 million pounds of lobster was landed in waters off the coast of Maine (82% of the total lobster landings in the United States), representing an ex-vessel value of approximately $500 million.  *See https://www.maine.gov/dmr/commercial-fishing/landings/ documents/LandingsBySpecies.Table.pdf* (last visited September 24, 2021).  By comparison, Massachusetts had landings of 17 million pounds in 2019.  *See Exhibit D* at 159.

39.     In addition to the roughly 4,800 lobster license holders in the State of Maine and 1,100 student license holders, lobster dealers, processors, sternmen, bait dealers, trap builders, boat mechanics, shipyards, and local coastal merchants all depend on the Maine lobster fishery for their very survival.  Maine's lobster supply chain contributes $1 billion to the State's economy each year on top of the value of its lobster landings.

40.     The regulation of Atlantic coast fisheries differs between state and federal waters. Waters within three nautical miles of shore are regulated by the individual states, while waters extending 200 nautical miles from the inner boundary of state waters (known as the "EEZ") are federal waters regulated by NMFS.  Both the federal and state governments regulate lobster fishing in U.S. waters through the Atlantic States Marine Fisheries Commission, which develops fishery management plans pursuant to which the member-states regulate the portion of the fishery within their respective state waters.  NMFS governs lobster fishing outside of the EEZ through species-

specific management plans developed by regional councils.

41.     The American Lobster fishery is divided into 7 Lobster Management Areas ("LMAs"): LMAs 1, 2, 3, 4, 5, 6, and the Outer Cape.  Each LMA has different effort control restrictions, such as trap limits, minimum/maximum sizes, gear requirements, and closed seasons. Lobster fishing off the coast of the State of Maine occurs in LMA 1:



42.     As of 2018, approximately 1,300 federal permits were issued to Maine fishermen and women for LMA 1, encompassing approximately 1,044,000 traps, making LMA 1 the most

productive LMA in the American Lobster fishery, and making Maine federal license holders the most active lobstermen in federal waters.  Maine fishermen lobstering in federal waters must declare a home zone where 51% of their gear must reside.  Fishermen from other states lobstering with a federal permit, on the other hand, can fish anywhere in federal waters off the coast of Maine.

43.     Fishermen harvest lobster utilizing trap and pot gear.  A lobster trap is defined as any structure or device other than a net that is fished on the ocean bottom by a lobster permit holder and is designed for or capable of catching lobsters. Traps must be marked with a trap tag and identified by either the federal or state permit number.  Traps/pots may be set singly with each trap having its own surface line and buoy or fished in trawls consisting of two or more traps per trawl. Traps/pots must also comply with the gear regulations, including buoy and groundline, storage, weak link, and traps per trawl requirements.

### The Interaction Between North American Right Whales and the American Lobster Fishery

44.     While North Atlantic right whales can become entangled in the vertical lines between a trap and a pot, the risk of entanglement varies depending on the time of year and the location of individual right whales.

45.     Given the seasonal distribution of North Atlantic right whales and the times when and areas where the American lobster fishery operates, North Atlantic right whales are most likely to overlap with trap/pot gear used in the American Lobster fishery from May through November in New England waters and throughout the fall and winter in Mid-Atlantic waters.

46.     Consequently, the location and exact sub-fishery in which each entanglement incident occurs can rarely be determined, and there remains great uncertainty regarding the source of entanglement mortality to the North Atlantic right whale population.  *See* 85 Fed. Reg. 86879.

47.     Between 2009 and 2018, there were 107 observed North Atlantic right whale entanglements worldwide, resulting in 48.5 serious injuries/mortalities.  Out of the 107 total

worldwide entanglements between 2010 and 2018, only 17 were determined to have been caused by trap/pot fishing gear, as opposed to other fishing gear, resulting in 9 serious injuries or mortalities:

**Number of entanglement interactions and M/SI by gear type from 2010-2018**
**Source: GAR Marine Animal Incident Database**

|  | Unknown | Gillnet | Net | Pot/Trap | Total |
|---|---|---|---|---|---|
| Entanglements | 82 | 6 | 2 | 17 | 107 |
| M/SI | 37 | 1.75 | 0.75 | 9 | 48.5 |

*See Exhibit A* at 218.

48.     Of those 107 observed right whale entanglements, only 8 were confirmed to have occurred in United States federal or state waters, and only 2 of those entanglements resulted in serious injury or mortality.  Canada, on the other hand, had 16 observed entanglements (resulting in 7.75 serious injuries or mortalities), while 83 entanglements (and approximately 38.75 serious injuries/mortalities) occurred in unknown countries:

**Observed entanglements of North Atlantic right whales from 2010 through 2018 by country of origin.**
**Entanglements resulting in M/SI are in the parentheses. Source: GAR Marine Animal Incident Database**

|  | Number of Entanglements | Confirmed Canada | Confirmed U.S. | Unknown Country of Origin |
|---|---|---|---|---|
| 2010 | 6 (4) | 0 | 1 | 5 (4) |
| 2011 | 14 (5.5) | 0 | 2 | 12 (5.5) |
| 2012 | 12 (4) | 0 | 1 (1) | 11 (3) |
| 2013 | 5 (0.75) | 0 | 0 | 5 (0.75) |
| 2014 | 17 (8) | 1 | 1 (1) | 15 (7) |
| 2015 | 9 (3.5) | 1 | 0 | 8 (3.5) |
| 2016 | 15 (9.5) | 3 (3) | 1 | 11 (6.5) |
| 2017 | 15 (6) | 8 (3) | 1 | 6 (3) |
| 2018 | 14 (7.25) | 3 (1.75) | 1 | 10 (5.5) |
| **Total** | **107 (48.5)** | **16 (7.75)** | **8 (2)** | **83 (38.75)** |

*See Exhibit A* at p. 216.

49.     In other words, only less than 0.2 of the observed entanglement-related mortalities and serious injuries per year could be attributed with any certainty to *any* type of fishing gear in federal or state waters between 2010 and 2018.  *See 2021 NMFS Final Rule*, attached hereto as Exhibit B.

50.     Between January of 2019 and March of 2021, there have been 11 North Atlantic right whale entanglement reports, with only 1 entanglement confirmed to have caused a mortality:

**Entanglement reports for right whales from January 2019 through March 2021**

| Date | First seen | Status |
|---|---|---|
| 4/25/2019 | East of Orleans, MA | Partially disentangled; gear shed |
| 6/29/2019 | East of Miscou Island, NB | Partially disentangled; gear shed |
| 7/4/2019 | East of Perce, QC | Partially disentangled |
| 8/6/2019 | Northeast of Iles de la Madeleine,Quebec | Deceased |
| 12/21/2019 | South of Nantucket | Entangled |
| 2/24/2020 | South of Nantucket | Entangled |
| 3/16/2020 | Georges Bank | Entangled |
| 10/11/2020 | East of Sea Bright, NJ | Entangled |
| 10/19/2020 | South of Nantucket | Mortality (preliminary cause ofdeath: entanglement) |
| 1/11/2021 | East of Fernandina Beach, FL | Entangled |
| 3/10/2021 | North of Sandwich, MA | Entangled (partially disentangled) |

*See Exhibit A* at p. 214.

51.     Between September of 2013 through 2017, only one entanglement has been confirmed to have been caused by lobster trap/pot gear (an entanglement in Massachusetts state waters in 2016), and there has not been a single entanglement attributed to Maine lobster gear since

2004:



**Right whale entanglements (including ones not resulting in serious injury or mortality) from 1997 through 2017 for which the set location and type of gear are known and gear was recovered.**



*See* NOAA Tech Memo NMFS NE. 247 at 11, *available at* https://downloads.regulations.gov/USCG-2019-0131-0039/attachment_2.pdf (last visited September 24, 2021).

52.     Since 2009 – the year that NMFS first required lobstermen to use sinking groundlines – there have been no right whale entanglements linked to groundlines in the United States lobster fishery.

53.     Of the 30 documented serious injuries or mortalities to right whales between 2017 and 2019, 21 occurred in Canada, with an additional two entanglements first sighted in U.S. waters attributed to Canadian snow crab gear entanglements.  8 of these serious injuries/mortalities were

attributed to vessel strikes.

54.     81% of all lines removed from entangled right whales have been greater than ½' in diameter, while 79% of the lines used in Maine waters are less than ½' in diameter, further evidencing that Maine lobster gear rarely, if ever, interact with North Atlantic right whales.

55.     In summary, there has not been an entanglement linked to Maine lobster fishing gear in LMA 1 since 2004, and even then, Maine lobster gear was not determined to be the originating or primary entanglement.

56.     On August 10, 2020, this Court denied a motion for a preliminary injunction enjoining the use of vertical lines in connection with lobster fishing in federal and state waters off the coast of Maine, finding that the evidence before it supported the conclusions that: 1) "Of the right whale entanglement cases where the fishery of origin is known, there have been none attributed to Maine lobster gear since 2004"; 2) "[R]eview of right whale entanglements for which the set location and type of gear are known, and gear was recovered from a whale indicates that no such entanglements occurring from September 2013 through 2017 were linked to gear set in Federal waters. For 2018 through September 2019, preliminary information compiled to date indicates that no fishing gear recovered from a North Atlantic right whale has been confirmed at this time as having been from a U.S. fishery"; 3) there was insufficient evidence to find a "causal link between the harm [to North Atlantic right whales from vertical lines], which is demonstrably real," and the use of vertical ropes in waters off the coast of Maine "based on nothing more than the *statistical girth demonstrating the ongoing injury to North Atlantic right whales generally*. . . . *legal causation does not turn on general statistical data or inductive reasoning*."  *See Order on Plaintiff's Motions for Preliminary Injunctions* at 7-8 (ECF No. 112), *M.A.X v. NMFS et al.*, USDCME Docket No. 1:19-cv-00406-LEW (Aug. 10, 2020) (emphasis supplied).  There has been no scientific data discovered after the date of this ruling that would alter this analysis.

## THE NEW REGULATORY SCHEME

57.     Since adopting the ALWTRP in 1997, NMFS has engaged in management efforts to reduce entanglement risks in United States waters that focus on gear technology to make entanglements less likely to harm or kill whales, restricting where and when gear that poses a risk of entanglement can be used when whales are likely to be present, and reducing the amount of gear in the water column.

**Timeline of significant management actions focused on reducing fishing entanglement**



*See* NOAA Tech Memo NMFS NE. 247 at 13, *available at* https://downloads.regulations.gov/USCG-2019-0131-0039/attachment_2.pdf (last visited Sept. 24, 2021).

58.     Until the spring of 2018, however, very few protections for right whales were in place in Canadian waters.  As of 2016, the number of traps used off the coasts of the Canadian provinces roughly equaled the number of traps used on the coasts of Massachusetts, New Hampshire and Maine combined, with Canadian lobster exports increasing substantially in the years since. *Id.*

59.     In 2014, NMFS issued a Biological Opinion (the "2014 BiOp") that concluded that

the American lobster fishery was not likely to jeopardize the continued survival or recovery of North Atlantic right whales if modifications to the ALWTRP reduced the PBR for North Atlantic right whales to slightly less than 1 per year.

60.     NMFS issued the 2014 BiOp before full-scale adoption of its modifications to the ALWTRP (also in 2014) that implemented protective measures that included the removal of floating lines, a ban on "wet storage" of gear in the water for more than 30 days, the addition of weak links in lines (designed to separate a pot from the weight of a trap in the event a right whale strikes a line), a mandate of sinking ground lines, and "trawling-up" requirements (meaning multiple traps to a pot, resulting in far fewer lines in the water column).

61.     The ALWTRP also adopted measures designed to reduce ship strikes, a leading cause of injuries and mortalities, by including vessel speed restrictions and rerouting measures that targeted shipping lanes in areas right whales do not frequent.

62.     Finally, NMFS included numerical triggers for re-initiation of ESA Section 7 consultation to ensure that any serious injuries or mortalities would not likely reduce appreciably the likelihood of both survival and recovery of right whales.

63.     Since the issuance of the 2014 BiOp and the modifications to the ALWTRP, NOAA and NMFS have not been able to identify any lobster gear permitted for use by NMFS in federal waters on a single entangled North Atlantic right whale.

64.     In January of 2017, NMFS estimated that approximately 451 North Atlantic right whales were in existence.  Beginning in June of 2017 and lasting through 2019, however, an unusual mortality event was declared after 12 North Atlantic right whale mortalities were observed in Canadian waters and another 5 in United States waters.  In 2018, there were 3 confirmed North Atlantic right whale mortalities observed in United States waters; in 2019, there were 10 observed right whale mortalities, 9 in Canadian waters and 1 in United States waters.  The causes of the

2018 and 2019 mortalities have not been determined.

65.     As a result of this unusual mortality event, NMFS reinitiated Section 7 ESA consultation in October of 2017 and reconvened the ALWTRT in order to propose recommendations to the ALWTRP that would further reduce the risk of entanglement for North Atlantic right whales as a result of entanglements in fishing gear.  In August of 2019, NMFS declared intentions to amend the ALWTRP and issue a new Biological Opinion as soon as practicable.

66.     On August 19, 2020, the United States District Court for the District of Columbia ordered NMFS to issue a new biological opinion by May 31, 2021, lest the 2014 BiOp be vacated.

67.     Because completion of a new biological opinion was linked to completion of the rulemaking process, and because North Atlantic right whales would lose the protections of the 2014 modifications to the ALWTRP if the 2014 BiOp was vacated, NOAA and NMFS had no choice but to comply with this aggressive and unprecedented deadline for issuance of a new biological opinion and, in effect, a near-final rule.  However, the aggressive timeline short-circuited the public comment process and hindered NMFS' ability to adequately analyze the available data.

68.     On December 31, 2020, NMFS issued a proposed rule seeking to implement modifications to the ALWTRP in order to reduce mortality and serious injury to North Atlantic right whales by 60%.  The proposed rule was accompanied by a draft Environmental Impact Statement as required by the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et. seq.*

69.     The proposed rule noted that 2017's unusual mortality event mostly "occurred in Canadian waters and not all were confirmed to be entanglement related."  85 Fed. Reg. 86879.

70.     The proposed rule also acknowledged that "[t]here is much uncertainty regarding the source of entanglement mortality to the North Atlantic right whale population."  *See id.*

71.     The proposed rule also acknowledged that disagreements among members of the ALWTRT concerning how much risk reduction was necessary and the metrics used to compare the wide range of proposals "challenged the Team's ability to develop recommendations." *Id.*

72.     Due to these disagreements, the proposed rule noted that the ALWTRT decided that "risk reduction should be shared across jurisdictions so that no one state or fishing area would bear the bulk of the restrictions," 85 Fed. Reg. 86880, notwithstanding the fact that lobster fishing constitutes a much larger part of the State of Maine's economy than it does for any other Atlantic state, and notwithstanding the fact that North Atlantic right whales are rarely seen in waters off the coast of Maine, and instead frequent Cape Cod Bay, the mid-Atlantic, and waters south of Nantucket, Massachusetts.

73.     The proposed rule also acknowledged that certain measures proposed by the various states (including Maine) were not adopted "because they were inconsistent between adjacent states."  85 Fed. Reg. 86880.

74.     With respect to seasonal restrictive areas, the proposed rule co-proposed three alternatives: 1) two new seasonal restricted areas (one south of Cape Cod and Nantucket that would be closed between February and April, the other a stretch of offshore Maine waters in LMA 1 along the border of LMA 3 that would be closed to vertical buoy lines between October and January but open to ropeless fishing); 2) not including any LMA 1 restricted area; and 3) implementing the LMA 1 closure only if a 60% reduction in entanglements had not been met based on information available prior to the start of October each year.  85 Fed. Reg. 86883-34.

75.     Importantly, the proposed rule noted that NMFS had not made any determination that any restricted area in LMA 1 was necessary to achieve the 60% reduction target, and the proposed rule acknowledged that neither the ALWTRT nor any state had proposed an LMA 1 Restricted Area open to ropeless fishing.  85 Fed. Reg. 86882.

76.     In fact, the State of Maine's Department of Marine Resources submitted a detailed proposal to NMFS explaining why entanglements in federal waters off the coast of Maine were extremely unlikely.  *See Dec. 27, 2019 Ltr. to NMFS from MDMR*, attached hereto as Exhibit C.

### *The 2021 Biological Opinion*

77.     On May 27, 2021, NMFS issued a new Biological Opinion (the "2021 BiOp") that concluded that the American Lobster fishery would not jeopardize the continued existence of North Atlantic right whales if modifications to the ALWTRP reduced the number of serious injuries/mortalities to right whales caused by federal fisheries by 60 percent.

78.     The 2021 BiOp relied on data pertaining to North Atlantic right whale mortalities and serious injuries occurring beginning in 2010 and ending in 2018 (the year following an unprecedented mortality event caused largely by entanglements and vessel strikes in Canadian waters) because 2010-2018 data was the best available information to estimate future right whale interactions with the fisheries, given that mortality estimates from 2019 and beyond were not yet available.  *See Exhibit A* at 215.

79.     The 2021 BiOp admitted that "[a]ssignment of an observed entanglement event to a specific fishery or country of origin is rarely possible . . . Therefore, we must make assumptions on the origin of the gear for cases where that information is not available."  *See Exhibit A* at 216.

80.      Despite the documented fact that the number of *confirmed* entanglements in Canadian fisheries was double the number of confirmed entanglements in U.S. fisheries (16 to 8); despite the fact that the number of serious injuries/mortalities confirmed to be caused by Canadian fishing gear was almost 4 times the number of serious injuries/mortalities confirmed to be caused by U.S. fishing gear (7.75 to 2); despite the fact that of the 30 documented serious injuries or mortalities to right whales between 2017 and 2019 caused for any reason, 23 occurred in Canada; despite the fact that right whales now spend significantly more time in Canadian waters (with half

of the right whale population spending six months in the Gulf of St. Lawrence alone[2]); and despite the fact that Canadian snow crab gear is heavier than lobster trap/pot gear "and poses a greater mortality risk than buoy lines associated with most nearshore lobster fisheries," the 2021 BiOp nevertheless apportioned a 50/50 split for serious injuries and mortalities of unknown origin based on "limited distribution information and transboundary fishing attributes," even though peer reviewers could not agree on the accuracy of this apportionment.  *See Exhibit A* at 216-217.

81.     Despite the fact that of the 107 entanglements occurring between 2010 and 2018, 17 were determined to be caused by trap/pot gear and 8 were determined to be caused by gillnet/net gear, the 2021 BiOp apportioned *all* of the unknown causes of entanglement resulting in serious injury or mortality to trap/pot gear.  *See Exhibit A* at 218-219.

82.     The 2021 BiOp also assumed that an additional 55.23 *undetected* mortalities between 2010 and 2020 were caused by fishing gear in U.S. waters.  Each of these 55.23 assumed mortalities was also assumed to be attributed to trap/pot gear, notwithstanding that the confirmed causes of entanglements suggest that at least 1/3 of these assumed mortalities would have been caused by gillnets/nets.  *See Exhibit A* at 221-222.

83.     NMFS, however, acknowledged that its models predicting unobserved right whale entanglements "cannot distinguish between true mortality and the appearance of mortality that would come from an individual permanently leaving the survey areas."  *Id.* at 23, 84-85.

84.     In fact, a study relied upon by NMFS to predict these unobserved right whale entanglements noted that there was "insufficient survey effort" in Canadian waters "to model this region confidently," meaning that the well-recognized fact that right whales are migrating away from the Gulf of Maine and toward Canadian waters is likely a major source of the "appearance

---

[2] Canada Dep't of Fisheries & Oceans, *Integrated Fisheries Management Plan for the Southern Gulf of St. Lawrence*, *available at* http://www.glf.dfo-mpo.gc.ca/Gulf/FAM/IMFP/2014-Lobster-Overview (last visited June 10, 2020).

of mortality" allegedly caused by U.S. fishing gear:



*See Supplemental Figure 3*, *Roberts et al.,* Habitat-based cetacean density models for the United States Atlantic and Gulf of Mexico (2016), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4776172/ (last visited September 16, 2021); *Exhibit B* at 85

85.     Nevertheless, based on these assumptions, the 2021 BiOp assumed that 69.29 entanglements causing serious injuries/mortalities to right whales occurred between 2010 and 2018 in Federal waters (an average of 7.57 a year), even though only *2* serious injuries/mortalities were actually *confirmed* to have been caused by U.S. fishing gear during that same period, even though of the 30 right whale mortalities between 2017 and 2019, only one could be determined to be traceable to a general area within U.S. waters (a vessel strike), and even though the only entanglement since September 2013 that *could* be attributed to a U.S. fishery was a case in 2016 where a right whale was entangled in Massachusetts state waters. *See Exhibit A* at 219-221, 229.

86.     The 2021 BiOp proceeded to assume that *all* entanglements were caused by lobster trap/pot gear (as opposed to fish or crab trap/pot gear) because NMFS was "unable to partition the entanglement data between the different trap/pot fisheries."  *See Exhibit A* at 225-226.

87.     As a result, the 2021 BiOp concluded that the ALWTRP would need to include

measures resulting in a 58.1 percent reduction in serious injury or mortality to North Atlantic right whales caused by trap/pot gear used in lobster fisheries in 2021 under the BiOp's "co-occurrence" model, with a ten-year goal of all but eliminating the use of vertical lines in the American Lobster fishery.  *See Exhibit A* at 224.

88.     The 2021 BiOp, however, did not specify any particular measures to achieve its 58.1 co-occurrence reduction.   Rather, the BiOp contained an "adaptive framework" that recommended some combination of the following measures: 1) reducing the co-occurrence between right whales and trap/pot gear by the number of vertical lines in the water column by increasing the number of minimum traps per "trawl" (the vertical line attached to the buoy); 2) allowing ropeless fishing in existing closure areas but adding additional areas where lobster fishing using vertical buoy lines would be seasonally prohibited; 3) requiring additional "weak links" in buoy lines designed to break free at 1700 pounds; and 4) gear marking requirements designed to enable NMFS to determine the source of any future entanglements.  *See Exhibit A* at 225.

89.     Finally, the 2021 BiOp contained an ITS for the "non-lethal take" of North Atlantic right whales.  *See Exhibit A* at 390.

90.     Because the ALWTRP required modifications in order to support the 2021 BiOp's no jeopardy conclusion, NMFS was forced to propose such modifications on a much faster timeline than previous modifications to the ALWTRP.

### The Final Environmental Impact Statement

91.     On July 2, 2021, a notice of the availability of the Final Environmental Impact Statement ("FEIS") analyzing alternative modifications to the ALWTRP was published in the Federal Register.  *See* 86 Fed. Reg. 35288.

92.     The FEIS recognized that there was much "uncertainty" concerning the data on right whale distribution, buoy line numbers, and configurations of trap/pot gear, which in turn led

to "uncertainty" about the effectiveness of the various risk reduction measures under consideration. *See FEIS Vol. I* at 38, attached hereto as Exhibit D.

93.     The FEIS also recognized the "shifting distribution of right whales has increased mortality incidents to unprecedented levels in Canadian waters, particularly the Gulf of St. Lawrence," and that "in recent years mortalities and serious injuries in U.S. fisheries may have caused fewer incidents than the anthropogenic mortalities in Canadian waters." *Id.* The FEIS noted that there had been 14 confirmed cases of entanglement in Canadian snow crab gear since 2010, whereas there were only 2 confirmed cases of entanglement in U.S. lobster gear. *Id.* at 50.

94.     Nevertheless, the FEIS assumed that 50% of all right whale serious injuries and entanglements occurred in U.S. waters because the effectiveness of the ALWTRP "cannot be evaluated." *Id.* at 57. Indeed, NOAA's 2020 Marine Mammal Stock Assessment Report for the North Atlantic right whale states that "[s]ince 2009, new entanglement mitigation measures (72 FR 193, 05 October 2007; 79 FR 124, 27 June 2014) have been implemented as part of the Atlantic Large Whale Take Reduction Plan, but their effectiveness has yet to be evaluated. One difficulty in assessing mitigation measures is the need for a statistically-significant time series to determine effectiveness." *See* 2020 NOAA Marine Mammal Stock Assessment Report, Right Whale, North Atlantic at 20, *available at* https://media.fisheries.noaa.gov/2021-07/f2020_AtlGmexSARs_ RightWhale.pdf?null (last visited Sept. 23, 2021).

95.     Although the FEIS claimed that risk reduction measures "should be shared across jurisdictions so no one state or fishing area would have to bear the bulk of reductions, and so that different jurisdictions could choose an approach that best fit their fishery," the FEIS noted that the LMA 1 Restricted Area was not included in the State of Maine's proposal to reduce the number of vertical lines in its coastal waters and had not been recommended by the ALWTRT. *Id.* at 69, 71.

96.     The FEIS noted two patently conflicting goals in implementing risk reduction

measures: to "spread risk reduction across jurisdictions," but also to "[d]irect the most protection to areas of predictable high seasonal aggregations of right whales, including substantial risk reduction across areas of likely occurrence and precautionary measures in other areas to be resilient to ecosystem changes and associated changing whale distribution." *Id.* at 75.

97.    The FEIS noted that "[t]o be effective, [closure] areas should not cause predictable relocation of lines to areas of high occurrence with right whales, inadvertently displacing risk." *Id.* at 78.

98.    Whereas the restricted area south of Martha's Vineyard and Nantucket was included "because it encompassed most of the sighting in the most recent two years when whale use of the area appeared to have shifted to the East," the FEIS acknowledged that the Gulf of Maine is "less important for right whales in recent years" and that "aerial surveys in recent years have been sparse for this area" and although "[s]ound traps placed along the Maine Coast this year may provide further information regarding the value of a seasonal closure to buoy lines in this area," at the time of the FEIS, "acoustic recordings for this season had not been uploaded or analyzed." *Id.* at 79, 81.

99.    The FEIS also rejected a potential closure in LMA 3 (Georges Basin), even though it had a co-occurrence with right whales, because the "relocation of gear out of this area into adjacent productive fishing grounds would increase risk for several large whale species just outside the boundaries of the area, possibly due to movement patterns through the entire region." *Id.* at 82.  The FEIS offered no explanation as to why the LMA 1 Restricted Area would not have a similar effect on other areas in LMA 1, given that lobstermen fishermen in the area are required to have a federal permit restricting their fishing to the LMA 1 area.

100.    The FEIS recognized that "spatial data is generally lacking on how fishing effort [gear location] is distributed in federal waters . . . within LMA 1," which "complicates the

assessment of entanglement risk in this region." *Id.* at 193. Although the FEIS also promised that "NMFS will monitor line numbers annually and associated co-occurrence with right whales to evaluate whether predicted line reduction occurs," the FEIS did not explain why such monitoring could not also be used as a trigger for an LMA 1 closure. *Id.*

101.    The FEIS found that although the LMA 1 Restricted Area "had declined in importance since 2010," the area still posed a higher entanglement risk than other areas simply "due to the number of buoy lines used in the area." *Id.* at 202.

102.    Importantly, the FEIS found that the LMA 1 Restricted Area only accounted for 5%-6% of the overall 60% risk reduction target, and that the total risk reduction of all measures would be between 69% and 73%. *Id.* at 277, 300.

103.    Although the FEIS predicted that the closure of 967 square miles in LMA 1 would impact "at least" 123 Maine fishing vessels, the FEIS only assigned half of those vessels to the restricted area. *Id.* at 272, 287. Even allocating only half of the potentially affected vessels to the closure area, the FEIS recognized that relocating these traps to other adjacent areas in LMA 1 would cause overcrowding in those areas that would reduce the annual catch of other federally-permitted LMA 1 vessels. *Id.* at 272.

104.    Nevertheless, the FEIS predicted only a 5%-10% reduction in catch on all traps typically fixed in the closure area. *Id.* In making that prediction, however, the FEIS neglected to take into account the territorial nature of fishing grounds, the lack of similar fishing grounds in adjacent areas, the increased fuel costs of traveling to different areas, or the fact that many vessels that fish in the LMA 1 Restricted Area only do so between October and January each year.

105.    The FEIS also did not take into account losses that Maine's coastal communities would suffer, including in particular the communities of Stonington and Vinalhaven, the port of call for many of the 123 affected vessels. With the loss of the millions of pounds of lobsters that

will result from the closure area, many bait dealers, wholesalers, and suppliers will go out of business.

106.     The FEIS stated that the final rule was expected to be published in October of 2021, *id.* at 374, leaving fishermen who lobster in the LMA 1 Restricted Area between October and January little to no time to map the bottom of alternative areas and effectively and safely relocate their traps.  Many of these fishermen will be entirely out of work as a result of the closure.

### The Final Rule

107.     On August 31, 2021, NMFS issued its final rule modifying the ALWTRP (the "Final Rule"), with changes to seasonal restricted areas to be effective 30 days after its publication in the Federal Register.  The Final Rule was published in the Federal Register on September 17, 2021 and takes effect 30 days after publication, meaning October 17, 2021, a month earlier than previously announced.  *See Exhibit B* at 1.[3]

108.     In addition to implementing risk reduction measures such as increasing the number of traps between buoy lines (thereby reducing the number of lines in the water column), requiring all buoy lines to use engineered weak rope or weak rope inserts (designed to have a buoy line break free from a trap in the event a whale strikes the line), implementing state-specific gear-marking requirements (to help identify the source of any future entanglements), and extending an existing closure area, the Final Rule established two new areas seasonally closed to the use of vertical buoy lines: an area south of Nantucket and Martha's Vineyard to be closed annually between February and April, and the LMA 1 Restricted Area, to be closed to vertical buoy lines annually between October and January.

---

[3] Owing to the fact that the proposed rule only proposed the LMA 1 Restricted Area as one of three co-proposals, as well as the fact that the Final Rule was issued approximately one month before the LMA 1 Restricted Area takes effect (whereas the other modifications to the ALWTRP in the Final Rule do not take effect until 2022), resolution of the Plaintiffs' Complaint likely will not be possible before October 17, 2021, the effective date of the LMA 1 Restrictive Area.  Accordingly, the Plaintiffs intend to file a motion for a preliminary injunction in advance of that date based on the record that is publicly available and will ask for an expedited briefing schedule in connection with that Motion.

109.    Although NMFS believes the Final Rule will reduce the risk of entanglement by 69%, which "far exceeds" the 60% risk reduction needed to achieve a PBR of below 0.8 as required by the MMPA and the FEIS, the LMA 1 Restricted Area provided only 6.6% of that risk reduction, meaning that *even without the LMA 1 Restricted Area, the Final Rule is still expected to achieve the desired 60% risk reduction across all U.S. waters.  See Exhibit B* at 59, 69, 75, 100.

110.    Although NMFS acknowledged in the Final Rule that "entanglement risk only exists when lines are present, whales are present, and the lines pose a risk to whales," the Final Rule simply found that because Maine has the highest concentration of vertical line gear in the United States, the LMA 1 Restricted Area posed a risk to right whales.  *Exhibit B* at 67.

111.    With respect to the presence of lines, NMFS recognized the lack of spatial data concerning the location of trap/pot gear, and it did not implement measures using Automatic Identification Systems (equipped on most lobster vessels) to gather this data.  *Id.* at 32, 71.

112.    With respect to whales being present in the LMA 1 Restricted Area, NMFS acknowledged that "right whale distribution has changed in the past decade, and there may be fewer or less dense aggregations of whales in the Gulf of Maine"; that no gear retrieved from a right whale had been traced to Maine lobster gear since the early 2000s; that the agency lacked acoustic and aerial surveys in LMA 1 to identify the areas of most risk to right whales, that "counts of individual[ right whales] when spread over large areas remain outside our current capabilities," and that it is "difficult to predict where entanglements will occur given the relative scarcity of identified locations of entanglement."  *Id.* at 39, 67, 78, 84-85.

113.    NMFS acknowledged that right whales typically follow copepods (their preferred prey), and that since 2010, "there has been a documented change in right whale prey distribution that has shifted right whales into new areas with nascent risk reduction measures," i.e., Canadian waters.  *Exhibit B* at 90.

114.    With respect to the risk of lines to right whales, NMFS admitted that the agency "lack[ed] an actual estimate of the proportion of the right whale population's exposure to U.S. or Canadian fisheries each year," and that the vast majority of identifiable sources of right whale entanglements had been in Canadian waters. *Id.* at 23, 84-85.

115.    NMFS also rejected the idea of adding a restricted area in a portion of LMA 3 that has a right whale hot-spot analysis that is five times greater than that of the LMA 1 Restricted Area because restricting lobstering in LMA 3 would aggregate fishing areas into other LMA 3 hot-spots, thereby increasing the density of lines and increasing the risk of entanglement in those areas.  By ignoring similar concerns within the LMA 1 Restricted Area, NMFS essentially conceded that LMA 1 is not a hot-spot for right whales.  *See Exhibit B* at 97.

116.    Moreover, NMFS also did not assess the possibility of creating a restricted area that overlapped between LMA 1 and LMA 3 (with a larger portion on the LMA 3 side), even though this would spread the burden of closure and likely would provide more benefit to right whales than the LMA 1 Restricted Area, because this "novel idea" was not proposed until after the proposed rule, meaning NMFS was "unable to implement it through final rulemaking at this time."  *Id.* at 102-103.  NMFS, however, proposed a number of "co-proposals" for restricted areas in the proposed rule and did not conclude that the LMA 1 Restricted Area was necessary to achieve 60% risk reduction at that time.  *See* 85 Fed. Reg. 86883-34.

117.    NMFS also did not consider dynamic area management – the process whereby the agency would actively manage the fishery by closing certain areas based on right whale detections – prior to implementing the Final Rule, even though Canada began implementing dynamic area closures in 2018 and NMFS had used dynamic area management in the past in relation to preventing vessel strikes.

118.    NMFS' stated reasoning for being unable to dynamically manage the various LMAs

was twofold.  First, the agency claimed that while it "may be able to support an intensive surveillance program when resources are available," NMFS presently did not have those resources, a model to "project prey and whale distribution into future months," or "real time data . . . to develop an effective trigger for restricted areas."  *See Exhibit B* at 93-94, 99.  The agency also claimed that "no feasible trigger was offered" by commenters.  *Id.* at 143.

119.    At the same time, however, NMFS has admitted that it does not conduct surveillance over the LMA 1 Restricted Area because right whales are not known to be present in that area and are mostly present in LMA 3.  *See id.* at 103.

120.    Second, NMFS claimed dynamic area management would not allow fishermen sufficient opportunity to remove their gear.  This claim ignores the reality that lobstermen presently face precisely that problem after receiving little notice of implementation of the LMA 1 Restricted Area, or the fact that most fishermen that lobster in that area could at least remove (but not relocate) their traps in as little as two days.  *Id.* at 54-55, 79.

121.    Although NMFS could not "identif[y] a geographic location or discrete temporal period within which emergency action would address a specific entanglement concern," *see Exhibit B* at 67, the LMA 1 Restricted Area in effect acted as an emergency action because it had not been proposed by any of the states or the ALWTRT, and NMFS explicitly announced that it had not made any determination that an LMA 1 Restricted Area was necessary to achieve the 60% reduction target as part of the proposed rule.  *See* Fed. Reg. 86882.

122.    NMFS anticipates holding annual meetings of the ALWTRT going forward to review North Atlantic right whale distribution and abundance data, mortality and serious injury updates, retrieved entanglement gear analyses, fishing effort data, and other relevant research, as well as to consider modifications to seasonal restricted areas.  *See Exhibit B* at 98.

123.    In connection with the Final Rule, however, NMFS admits that it did not evaluate

the effectiveness of existing regulations designed to reduce the risk of entanglement, such as sinking groundlines and weak points, before issuing the Final Rule, or the impact on right whale serious injuries/mortalities as a result of fishing activities in the southern states (where right whales breed). *Id.* at 32, 64, 70-71.

124.    Such data and evaluation are essential, as NMFS admits that between the time of the proposed rule and the Final Rule, newly-available data indicated that the LMA 1 Restricted Area contributes even *less* risk reduction benefit than previously believed.  Nevertheless, NMFS included the LMA 1 Restricted Area in the Final Rule as part of its effort to "spread risk reduction across jurisdictions." *Id.* at 100.

### COUNT I
### VIOLATION OF THE APA – ARBITRARY AND CAPRICIOUS FINAL RULE
### (5 U.S.C. § 706(2)(A))

125.    The Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 124 above.

126.    The Plaintiffs do not challenge the 2021 BiOp or the FEIS, without which NMFS cannot authorize continued lobster fishing in federal waters.  Rather, the Plaintiffs challenges the LMA 1 closure area imposed by the Defendants' final rule as arbitrary and capricious based on the scientific findings in those publications, as well as for failing to take into account the lack of data and unreliable assumptions underlying those findings, in determining that a seasonal closure of an area within LMA 1 without any triggering events is necessary to achieve a 60% reduction in right whale entanglements in all United States waters.

127.    Under the APA, a court must set aside any final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

128.    Under the APA, an agency cannot justify a final rule simply by pointing out the substantial uncertainty surrounding the underlying data.  Rather, any modifications to the

ALWTRP must articulate a satisfactory explanation for the Final Rule, including a rational connection between the facts found and the choice made, and the Final Rule cannot be the product of NMFS's failure to consider an important aspect of the issue presented or based on an explanation for the Final Rule that runs counter to the evidence before the agency.

129.    Moreover, an agency changing its course is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.

130.    The LMA 1 Restricted Area in the Final Rule is arbitrary and capricious, *inter alia*, because:

> a)      The Final Rule relied on an arbitrary 50/50 apportionment between U.S. and Canadian mortalities in arriving at its 60% reduction target, an apportionment that is not supported by data on the known causes of entanglements, as support for its conclusion that the LMA 1 Restricted Area was necessary;

> b)      The Final Rule relied on an arbitrary apportionment on all unknown causes of right whale entanglement to lobster trap/pot gear, an apportionment that is not supported by data on the known causes of entanglements, as support for its conclusion that the LMA 1 Restricted Area was necessary;

> c)      The Final Rule relied on a model to predict right whale density and unobserved mortalities that did not include any survey information for right whale critical habitats in Canadian waters;

> d)      The Final Rule relied on data concerning entanglements that largely occurred before Canada implemented protective measures in 2018;

> e)      The LMA 1 Restricted Area was not necessary to achieve the Final Rule's goal of a 60% reduction in entanglements because NMFS expects the Final Rule to reduce entanglements by 69%, with the LMA 1 Restricted Area only accounting

for 6.6% of that percentage;

f)      There is no evidence demonstrating a causal connection between Maine fishing gear in federal waters and the entanglement of North Atlantic right whales;

g)      NMFS did not evaluate the effectiveness of past risk reduction measures before implementing the LMA 1 Restricted Area;

h)      NMFS did not consider key alternatives to the LMA 1 Restricted Area;

i)      The Final Rule was not based on aerial surveillance or recent acoustic detections in the LMA 1 Restricted Area, the best scientific evidence available;

j)      NMFS did not give due consideration to dynamic area management and instead relied on the absence of public comment on suggested triggering mechanisms, in violation of its statutory duties;

k)      The LMA 1 Restricted Area was not proposed by the ALWTRT, the group with the most experience in regulating the industry and protecting the North Atlantic right whale; and

l)      The LMA 1 Restricted Area is not supported by spatial data on the location of trap/pot gear, right whale distribution surveys, right whale tagging, aerial surveillance, acoustic monitoring, or any analysis or research into right whale availability or future shifts in copepod distribution, even though this data was available to NMFS.

131.    NMFS has made statements that conflict with the data cited in support of the LMA 1 Restricted Area since 2018.  On July 7, 2020, for example, Jennifer Anderson, the then-Assistant Regional Administrator for Protected Resources in the Greater Atlantic Regional Fisheries Office (the regional office of NOAA Fisheries), stated that:

a)      "Past surveys demonstrated the existence of seven areas where western North Atlantic right whales aggregated seasonally: the coastal waters of the southeastern U.S.; the Great South Channel offshore of Massachusetts; Jordan Basin southeast of Maine and southwest of Nova Scotia; Georges Basin along the northeastern edge of Georges Bank far offshore south of Nova Scotia; Cape Cod and Massachusetts Bays; Canada's Bay of Fundy; and the Roseway Basin on the Scotian Shelf," while recent evidence demonstrated a shift to Canadian waters and a region south of Martha's Vineyard and Nantucket.  *See M.A.X. v. NMFS et al.*, ECF No. 82-2 at ¶¶ 6-7, USDCME Docket No. 1:19-cv-00406-LEW.

b)      Of the 30 right whale mortalities between 2017 and 2019, only one could be determined to be traceable to a general area within U.S. waters, and that mortality was caused by a vessel strike.  *Id.* at ¶ 8.

c)      Many mortalities observed in U.S. waters can be traced to entanglements in Canadian fishing gear.  *Id.* at ¶¶ 12-13.

d)      "The only entanglement from September 2013 to present for which gear could be identified to a U.S. fishery was a case in 2016 in which the gear was set in state waters [in Massachusetts]," and no entanglements in 2018 and 2019 could be confirmed as resulting from gear in a U.S. fishery.  *Id.* at ¶ 15.

132.    NMFS's Final Rule with respect to the LMA 1 Restricted Area is therefore in violation of the APA. 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs District 4 Lodge of the International Association of Machinist and Aerospace Workers, Local Lodge 207, *f/k/a* IAMAW Maine Lobstering Union – Local 207, Damon Family Lobster Co., Inc., Fox Island Lobster Company and Frank Thompson respectfully requests that the Court:

A)      Declare that the LMA 1 Restricted Area to be arbitrary, capricious, an abuse of discretion, and/or is not in accordance with the law in violation of the APA;

B)      Restrain the Defendants from implementing the LMA 1 Closure Area unless and until it demonstrates that the LMA 1 Closure Area is necessary in order to not jeopardize the continued existence of North Atlantic right whales based on an evaluation of the effectiveness of the ALWTRP's other risk reduction measures, spatial data on the location of trap/pot gear, right whale distribution surveys, aerial surveillance, acoustic monitoring, analysis or research into right whale migration or future shifts in copepod distribution, potential triggering mechanisms, and other feasible alternatives not previously considered; and

C)      Award the Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

D)      Such other relief as the Court deems just and proper.

Dated at Portland, Maine this 27th day of September, 2021.

/s/      Jay P. McCloskey
         Jay P. McCloskey

/s/      Paula D. Silsby
         Paula D. Silsby

/s/      Thimi R. Mina
         Thimi R. Mina

/s/      Alfred C. Frawley IV
         Alfred C. Frawley IV

38

MCCLOSKEY, MINA, CUNNIFF & FRAWLEY, LLC
12 City Center
Portland, Maine 04101
207.772.6805
207.879.9375
jmccloskey@lawmmc.com
psilsby@lawmmc.com
tmina@lawmmc.com
afrawley@lawmmc.com

*Counsel for District 4 Lodge of the*
*International Association of Machinists and*
*Aerospace Workers, Local Lodge 207, f/k/a,*
*IAMAW Maine Lobstering Union – Local*
*207, Damon Family Lobster Co., Inc., Fox*
*Island Lobster Company, LLC and Frank*
*Thompson*