## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LOCAL LODGE 207, *f/k/a*, IAMAW MAINE LOBSTERING UNION – LOCAL 207, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> GINA M. RAIMONDO, *in her official capacity as Secretary*, United States Department of Commerce, *et al.*, <br><br> *Defendants*, <br><br> and <br><br> CENTER FOR BIOLOGICAL DIVERSITY, CONSERVATION LAW FOUNDATION, and DEFENDERS OF WILDLIFE, <br><br> *[Proposed] Intervenor-Defendants.* | Case 1:21-cv-00275-LEW |

## DECLARATION OF MIYOKO SAKASHITA

I, Miyoko Sakashita, declare as follows:

1. This declaration is based on my personal knowledge. The facts set forth are true to the best of my knowledge and recollection. If called, I could and would testify to these facts in a court of law.

2. I am a resident of Oakland, California, and I have been a staff member of the Center for Biological Diversity ("the Center") since October 2006. I also have been a member of the Center since 2005.

3. Currently, I serve as the director of the Center's oceans program. I work with our legal and scientific staff and other organizations to advance the Center's goal of marine wildlife and habitat protection through administrative actions and reform, scientific research, and the judicial process. In my capacity as director of the oceans program, I am familiar with nearly all aspects of the Center's activities and organizational interests.

4. The Center is a non-profit corporation dedicated to preserving, protecting, and restoring biodiversity, native species, ecosystems, and public lands. The Center has over 84,000 active members, each of whom shares a commitment to support the Center's work conserving marine and terrestrial biodiversity and ecosystems. The Center's members seek to observe and enjoy marine wildlife, including North Atlantic right whales. The Center's members and staff regularly use waters off the U.S. East Coast—from Maine to Florida—to sail, kayak, take photographs, study and view right whales and other species, and engage in other recreational pursuits. Our members have spiritual, scientific, professional, aesthetic, and/or recreational interests in right whales and other species.

5. As part of our mission, the Center continuously monitors, educates the public about, and

1

engages in governmental actions and decisions affecting imperiled species, their habitats, and our climate. The Center regularly engages in administrative and legislative advocacy, education, and, where necessary, litigation to ensure our nation's environmental laws are upheld, implement, enforced, and improved. Among the laws we work on are the Endangered Species Act ("ESA"), Marine Mammal Protection Act ("MMPA"), and others. This work has brought the Center to the forefront in the battle to reverse the extinction crisis.

6. The Center produces a wide array of educational and informational materials concerning threatened and endangered species and their habitats. These materials are disseminated to the Center's members, policymakers, local, state, federal and international governmental officials, nonprofit organizations, and interested members of the public. The Center also maintains an active website and produces a quarterly newsletter in which we regularly highlight our concerns regarding imperiled species, including North Atlantic right whales.

7. The Center has a long-standing interest in the conservation of wildlife in the Atlantic Ocean. To further that interest, the Center has worked to reduce threats and secure protections for numerous species that live in and migrate through waters off the U.S. East Coast.

8. The Center has long-sought to protect critically endangered North Atlantic right whales. For example, in 2005, the Center petitioned to identify the North Atlantic right whales as a distinct population under the ESA. We also petitioned to expand right whale critical habitat and filed a lawsuit to secure the protections. In 2016, the National Marine Fisheries Service identified 39,414 square miles of ocean as critical habitat for the North Atlantic right whales.

9. The Center has also worked to reduce the risk of vessel traffic to North Atlantic right whales through administrative advocacy, legal rulemaking petitions, and lawsuits. For example, the Center was among several groups that petitioned the Fisheries Service in both 2012 and 2020

to expand its rule that requires large ships to slow to 10 knots or less in certain areas at certain times of year to apply in more areas and to smaller vessels, among other asks.

10. The Center also works to reduce the threats to right whales posed by anthropogenic noise pollution in our oceans. The Center's work to reduce the threat of high intensity noise to the species includes lawsuits and advocacy to protect biologically important areas and mitigate the impacts of seismic surveys and sonar. For example, the Center was actively engaged in fighting the approval of seismic airgun blasting to search for oil in the mid- and south- Atlantic Ocean because of the harms it would cause to right whales and their prey.

11. The Center also works in various ways to protect right whales from entanglement in commercial fishing gear. For example, the Center filed a lawsuit in the U.S. District Court for the District of Columbia in 2018 against the Fisheries Service for violating the ESA and MMPA in managing the lobster fishery given the fishery's harmful impact on right whales. The lawsuit challenged the then-existing biological opinion on the lobster fishery for failing to comply with the ESA because it failed to include a legally required incidental take statement and failed to consider the sub-lethal impacts from entanglements; alleged the Fisheries Service was failing to ensure its authorization and management of the lobster fishery was not jeopardizing the continued existence of the right whale in violation of section 7 of the ESA; alleged the Fisheries Service's authorization and management of the fishery was causing unpermitted take of right whales in violation of the section 9 of the ESA and the MMPA.

12. The Center also filed a legal petition with the Fisheries Service in 2020 under section 118(g) of the MMPA. The petition requested the agency declare that deaths and serious injuries of North Atlantic right whales from commercial fisheries are having, or are likely to have, an immediate and significant adverse impact on the species; and to issue emergency regulations to

alleviate that impact including closing areas of the ocean to lobster fishing with vertical buoy lines.

13. In addition, Center staff represent conservation interests on the Atlantic Large Whale Take Reduction Team, a stakeholder group that works to develop recommendations for management measures to reduce mortality and serious injury of North Atlantic right whales, and other large whales, in the lobster fishery and other fisheries operating in the Atlantic Ocean.

14. The Center actively participated in the processes that led to the recent 2021 amendments to the Atlantic Large Whale Take Reduction Plan, including through participating in various Team meetings and drafting comments on the draft biological opinion on operation of the lobster fishery and other fisheries in the Atlantic that affect endangered species, the proposed Plan amendments, and draft environmental impact statement.

15. The Center commented on the Fisheries Service's draft "Endangered Species Act Section 7 Consultation on the: (a) Authorization of the American Lobster, Atlantic Bluefish, Atlantic Deep-Sea Red Crab, Mackerel/Squid/Butterfish, Monkfish, Northeast Multispecies, Northeast Skate Complex, Spiny Dogfish, Summer Flounder/Scup/Black Sea Bass, and Jonah Crab Fisheries and (b) Implementation of the New England Fishery Management Council's Omnibus Essential Fish Habitat Amendment 2 [Consultation No. GARFO-2017-00031]." The Center also commented on the document the agency released along with the draft biological opinion entitled "North Atlantic Right Whale Conservation Framework for Federal Fisheries in the Greater Atlantic Region" that sets out the agency's intent to implement a series of unspecified rulemakings over the course of roughly the next ten years to reduce right whale death and series injury in commercial fisheries.

16. The Center's comments highlighted numerous flaws with the consultation including that

the agency action as defined in the biological opinion is overinclusive because the Framework itself is not an agency action and cannot form the basis for a reasoned no jeopardy conclusion; that the agency action as defined in the consultation is underinclusive because it excludes fishing in state waters; and that the draft biological opinion failed to include a proper incidental take statement. The comments also emphasized that the agency's approach, including the Framework, will only perpetuate the agency's violations of the ESA and MMPA at the expense of endangered right whales in desperate need of protection from entanglements.

17. The Center also commented on the proposed rule to amend the Atlantic Large Whale Take Reduction Plan. The comments urged the agency to do far more to protect the species than what the agency proposed. The comments pointed out that since the Fisheries Service first issued the Plan in 1997, the agency has never complied with its MMPA obligation to bring mortalities and serious injuries in the lobster fishery to below the right whale's potential biological removal, let alone the MMPA's directive that the Fisheries Service enact measures to reduce mortality and serious injuries to insignificant levels approaching zero. The comments also noted that these failures are due in large part to the agency's continued failure to close large areas of the ocean to fishing with vertical buoy line and its choice to instead issue a series of complex gear modification requirements that do not sufficiently reduce entanglement risk. The comments further reiterated that the Fisheries Service is violating the ESA by continuing to allow unpermitted right whale take in both state and federal waters without consequences. Those comments supported a seasonal closure in the LMA1 Restricted Area to close the area to vertical buoy lines from October to February because the best available science demonstrates that the area is a foraging hotspot for right whales, but opposed the agency's proposal that would allow

5

the Regional Administrator the discretion to determine whether the closure should go into place for a given season based on non-identified criteria.

18. The Fisheries Service issued the final biological opinion in May 2021 and the final rule amending the Plan in September 2021. Upon issuance of the final rule, the Center filed a supplemental complaint in its existing lawsuit in the U.S. District Court for the District of Columbia challenging the biological opinion and final rule for failing to comply with the ESA and MMPA, respectively. The complaint alleges that the biological opinion fails to properly define the agency action subject to review; and fails to include a proper incidental take statement authorizing and mitigating the take from the lobster fishery the agency acknowledges is occuring and will continue to occur each year. The complaint also alleges that the final rule fails to adopt measures to drive right whale mortality and serious injury to below the whale's potential biological removal level within six months as required by law; and that the Fisheries Service's ongoing delay in complying with the MMPA's mandate that the agency implement measures to reduce right whale serious injury and mortality to insignificant levels approaching zero is unlawful.

19. From my work, I have learned that entanglement in commercial fishing gear is one of the primary threats to the right whale's continued existence. I know entanglements can kill the whales outright via drowning or cause them to die slowly of starvation or other problems. I also know entanglements can cause wounds and infections and can cause the whales so much stress that it affects their ability to successfully reproduce. I also know that the right whale has been experiencing a significant population decline since 2010, reduced calving rates, and an unusual mortality event unprecedented in modern times. The population is doing so poorly that the Fisheries Service considers it one of nine marine species whose extinction is almost certain in the

immediate future if existing threats are not dramatically reduced. The agency lists protecting the whales from entanglements as the highest priority for saving the species.

20. The population is so low that the Fisheries Service has determined every single whale counts when it comes to ensuring the survival (and ultimate recovery) of the species. But the agency's actions have not matched its words. The Fisheries Service's failure to take sufficient action to prevent right whales from continuing to be entangled, injured, and killed in lobster gear means this highly imperiled species does not have sufficient protections. The Fisheries Service's failure to comply with the law and take sufficient action to protect right whales from entanglements while allowing fishing to continue is pushing the species closer to the brink of extinction.

21. The Fisheries Service's failure to adequately protect right whales from entanglement in lobster gear adversely affects the Center's organizational interests, and our members' interests in seeing and conserving this species. Rolling back the increased protections the new rule provides via new seasonal restricted areas, including the seasonal closure to vertical buoy lines in LMA1, will increase risk to the species and harm our members' interests in ensuring better protections for the whales are in place on the water.

I declare under penalty of perjury that I have read the foregoing declaration and know the contents thereof to be true of my own knowledge.

DATED: October 1, 2021 in Oakland, California.

_____
Miyoko Sakashita