## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LOCAL LODGE 207, *f/k/a*, IAMAW MAINE LOBSTERING UNION – LOCAL 207, *et al.*, | ) ) ) ) ) ) ) | **Case 1:21-cv-00275-LEW** |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| GINA M. RAIMONDO**,** *in her official capacity as Secretary*, United States Department of Commerce, *et al.*, | ) ) ) ) | |
| *Defendants*, | ) ) | |
| and | ) ) | |
| CENTER FOR BIOLOGICAL DIVERSITY, CONSERVATION LAW FOUNDATION, and DEFENDERS OF WILDLIFE, | ) ) ) ) ) | |
| *[Proposed] Intervenor-Defendants.* | ) ) | |

## CONSERVATION GROUPS' OBJECTION TO PLAINTIFFS'
## EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

LIST OF DOCUMENTS CITED ......................................................................................... i

INTRODUCTION ......................................................................................................1

BACKGROUND .......................................................................................................1

I.      The Critically Endangered North Atlantic Right Whale.........................................1

II.     The Marine Mammal Protection Act ......................................................................2

III.    The Endangered Species Act ..................................................................................3

IV.     Procedural History ................................................................................................3

ARGUMENT ..........................................................................................................6

I.      Standard of Review for Preliminary Injunction.....................................................6

II.     Plaintiffs Fail to Meet Their Burden to Show Likelihood of Success
        on the Merits .........................................................................................................7

        A.      The LMA 1 Restricted Area Is Consistent with the Purpose of the MMPA
                and Based on the Best Available Science ...................................................7

        B.      NMFS Gave Due Consideration to Alternatives .......................................13

III.    Plaintiffs Fail to Satisfy Their Burden to Demonstrate Irreparable Harm.............15

IV.     The Balance of Equities and Public Interest Strongly Disfavor an Injunction ......17

CONCLUSION.......................................................................................................20

## LIST OF DOCUMENTS CITED

The following is a list of cited documents and the location at which those documents may

be found in the record currently before the Court.

| | |
|---|---|
| Final Environmental Impact Statement, Regulatory Impact Review, and Final Regulatory Flexibility Analysis for Amending the Atlantic Large Whale Take Reduction Plan: Risk Reduction Rule, Vol. (FEIS) | ECF No. 1-4, Exhibit D to Pls.' Compl. |
| National Marine Fisheries Service, Endangered Species Act Section 7 Consultation on the: (a) Authorization of the American Lobster, Atlantic Bluefish, Atlantic Deep-Sea Red Crab, Mackerel/Squid/ Butterfish, Monkfish, Northeast Multispecies, Northeast Skate Complex, Spiny Dogfish, Summer Flounder/Scup/Black Sea Bass, and Jonah Crab Fisheries and (b) Implementation of the New England Fishery Management Council's Omnibus Essential Fish Habitat Amendment 2 [Consultation No. GARFO-2017-00031] (BiOp) | ECF No. 1-1, Exhibit A to Pls.' Compl. |
| National Marine Fisheries Service, Record of Decision for the Final Environmental Impact Statement on Amendment to the Atlantic Large Whale Take Reduction Plan: Risk Reduction Rule (ROD) | Exhibit 2 to Fed. Defs.' Opp. to Pls.' Mot. |
| Richard Pace et al., Cryptic mortality of North Atlantic right Whales, Conservation Science and Practice, e346 (2021) (Pace et al. 2021) | Exhibit 1 to this Opp. to Pls.' Mot. |
| Jessica Taylor et al., Shark predation on North Atlantic right whales (Eubalaena glacialis) in the southeastern United States calving ground, 29(1) Marine Mammal Science, 204–212 (2012) (Taylor et al. 2012) | Exhibit 2 to this Opp. to Pls.' Mot. |
| NMFS, Immediate Action Needed to Save North Atlantic Right Whales (July 3, 2019 | Exhibit 3 to this Opp. to Pls.' Mot. |

NMFS, 10 Things You Should Know About North Atlantic Right Whales (Oct. 17, 2019)

Exhibit 4 to this Opp. to Pls.' Mot.


NMFS, Species in the Spotlight Priority Actions 2021–2025: North Atlantic Right Whale (March 2021)

Exhibit 5 to this Opp. to Pls.' Mot.


Michael Moore et al., Assessing North Atlantic right whale health: threats, and development of tools critical for conservation of the species, 143 Dis. Aquat. Org. 205–226 (2021) (Moore et al. 2021)

Exhibit 6 to this Opp. to Pls.' Mot.


NMFS, Technical Memorandum NMFS-NE-247, North Atlantic Right Whales – Evaluating Their Recovery Challenges in 2018 (NMFS Tech Memo 2018)

Exhibit 5 to Fed. Defs.' Opp. to Pls.' Mot.

**INTRODUCTION**

The National Marine Fisheries Service (NMFS) established the Lobster Management Area 1 (LMA 1) Restricted Area based on the best available science to protect the North Atlantic right whale from becoming entangled in heavy, dangerous lobster gear. Plaintiffs fail to carry their substantial burden to meet any of the factors necessary to demonstrate their right to the extraordinary relief of a preliminary injunction against implementing the Restricted Area.

**BACKGROUND**

**I.    The Critically Endangered North Atlantic Right Whale**

With fewer than 360 surviving individuals, the North Atlantic right whale is one of the most endangered large whales on Earth. *See* Final Environmental Impact Statement (FEIS) at 2 (ECF No. 1-4). The species' continued existence depends on no more than one right whale (technically, no more than 0.8) being killed by human activity each year. *Id.*

By the end of the nineteenth century, commercial whalers had nearly exterminated the species. FEIS at 5, 128. Following many years of slow recovery, it started declining again in 2010 due to decreased calving rates and increased mortality. 85 Fed. Reg. 86,878, 86,879 (Dec. 31, 2020). The decline accelerated around 2015. 86 Fed. Reg. 51,970, 51,993 (Sept. 17, 2021). Humans continue to kill right whales with vessels and fishing gear, preventing their recovery. FEIS at 130. There is little evidence that natural causes affect right whale mortality rates except at the calf stage. Biological Opinion (BiOp) at 83 (ECF No.1-1). Adult female mortality is the main factor driving the species' decline. *Id.* at 221. Since 2000, fishing gear entanglement has been the primary cause of death identified when such cause could be determined. FEIS at 45.

We are now in the fifth straight year of an Unusual Mortality Event. Since 2017, 34 right whales have been confirmed killed and 17 have been documented with serious (i.e., likely lethal)

injuries. NMFS, 2017–2021 North Atlantic Right Whale Unusual Mortality Event.[1] Eleven of the mortalities and 11 of the serious injuries have been in U.S. waters. *Id.* But these shocking numbers are only the tip of the iceberg. From 2010 to 2017 only 29 percent of right whale deaths were observed. Of the 71 percent of right whale deaths that are unobserved, entanglement deaths significantly outnumber deaths by vessel strikes or other causes. Pace et al. 2021 at 6 (Ex. 1). NMFS now estimates that, on average, 7.57 right whales are killed or seriously injured by entanglements in U.S. trap/pot gear in each year. BiOp at 224. Non-lethal entanglements also affect both survival and reproduction. 86 Fed. Reg. at 51,992, 52,001; BiOp at 84–85.

## II.      The Marine Mammal Protection Act

Congress enacted the Marine Mammal Protect Act (MMPA) in 1972 to address the concern that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities" to and ensure marine mammals are "protected and encouraged to develop to the greatest extent feasible." 16 U.S.C. § 1361(1), (6). "The interest in maintaining healthy populations of marine mammals comes first" under the statute. *Kokechik Fishermen's Ass'n v. Sec'y of Comm.*, 839 F.2d 795, 800, 802 (D.C. Cir. 1988).

The MMPA establishes a complete moratorium on the unauthorized "taking" of marine mammals, *id*. § 1371(a); *see also id.* § 1372(a). Prohibited takes include actions that harass, hunt, capture, or kill marine mammals, *id.* § 1362(13), or that have the potential to injure a marine mammal to disrupt its behavioral patterns. *Id*. § 1362(18)(A). As relevant here, section 118 establishes exemptions for the incidental take of endangered marine mammals in commercial fishing operations in state and federal waters. 16 U.S.C. § 1387(a)(2). NMFS publishes a list of fisheries that cause "frequent" or "occasional" mortality and serious injury to marine mammals,

---

[1] https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2021-north-atlantic-right-whale-unusual-mortality-event.

identified as Category I and II fisheries. *Id.* § 1387(c)(1)(A)(i), (ii). It must then develop a take reduction plan for Category I and II fisheries that interact with strategic stocks, including the right whale. *Id.* §§ 1387(f)(1), 1362(19)(C). Each plan must contain regulatory measures to reduce fishery-related mortality and serious injury to below the species' potential biological removal level (PBR)[2] within six months of the plan's implementation. *Id.* § 1387(f)(2), (f)(5)(A). NMFS must amend a plan as necessary to reduce serious injuries and mortalities to below PBR. *Id.* § 1387(f)(7)(A). NMFS develops and revises a take reduction plan in consultation with a stakeholder group called a take reduction team. The team is an advisory body; NMFS alone has the ultimate duty of complying with the MMPA. *Id.* § 1387(f)(2), (7).

### III.    The Endangered Species Act

Considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," the Endangered Species Act (ESA) embodies Congress' "plain intent" to "halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978). The ESA "provide[s] a program for the conservation of . . . endangered species," 16 U.S.C. § 1531(b). The goal of the statute is not to maintain a species on life support indefinitely but to recover the species to the point where it no longer requires ESA protections. *See id.* § 1532(3). Section 7 of the ESA reflects Congress's intent to require federal agencies to "afford first priority to the declared national policy of saving endangered species," even above their primary missions. *TVA v. Hill*, 437 U.S. at 184–85.

### IV.    Procedural History

In 1996, in response to the high level of large whale mortality in the Atlantic from U.S. commercial fisheries, NMFS established the Atlantic Large Whale Take Reduction Team

---

[2] PBR is "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id.* § 1362(20).

(Team). 62 Fed. Reg. 16,519, 16,520–21 (Apr. 7, 1997). From the Atlantic Large Whale Take Reduction Plan's (Plan) inception, NMFS acknowledged that reducing entanglement risk for right whales would be especially difficult and that "extensive closures of large areas of the ocean to lobster and gillnet fishermen . . . would guarantee reduction of entanglements causing serious injury and mortalities." 62 Fed. Reg. 31,157, 39,159 (Jul. 22, 1997).

Although the Plan has been modified several times, it has not yet succeeded in consistently bringing human-caused mortality and serious injury of right whales in U.S. commercial fisheries to below PBR. Annual levels of mortality and serious injury have been well above PBR for many years; entanglements are the primary identifiable cause. 86 Fed. Reg. at 51,970, 59,180; FEIS at 45. Since 2010, when the current population decline began, there has been only one year "in which right whale entanglement mortality and serious injury first seen in U.S. waters or known to be caused by U.S. gear . . . was below PBR." FEIS at 55. NMFS has consistently determined that the American lobster fishery is a Category I fishery that causes "frequent" mortality and serious injury of right whales. 86 Fed. Reg. 3028, 3029, 3052 (Jan. 14, 2021); 85 Fed. Reg. 21,079, 21,080, 21,096 (Apr. 16, 2020).

In late 2017, in response to new science about the population's decline as well as the unprecedented mortalities in U.S. and Canadian waters that year, NMFS began reconvening the Team to develop new recommendations to amend the Plan. 86 Fed. Reg. at 51,970–71; FEIS at 67. Fixed gear fisheries pose the biggest entanglement risk by far to right whales. 86 Fed. Reg. at 51,989. In particular, the American lobster/Jonah crab fishery "contributes the vast majority of vertical lines" in the right whale's migratory path from Maine to Florida." *Id.* at 51,981. Over 93 percent of these lines are fished along the Northeast Atlantic coast. *Id.* at 51,989. NMFS made the reasonable decision to direct the Team's initial efforts toward this fishery. *Id.* at 51,987.

After a series of Team meetings and the development of a near-consensus Team recommendation in April 2019, 85 Fed. Reg. at 86,879, NMFS complied with section 118 by formally initiating rulemaking in August 2019. *See, e.g.*, 84 Fed. Reg. 37,822, 37,823 (Aug. 2, 2019) (scoping notice). NMFS held numerous public meetings during scoping and on the proposed rule. 85 Fed. Reg. at 86,880; 86 Fed. Reg. at 51,975.

On May 27, 2021, NMFS released its final biological opinion concluding that U.S. commercial fisheries entangle 15.125 percent of the right whale population each year, BiOp at 221, and that trap/pot fisheries in state and federal waters currently kill or seriously injure an average of 7.57 right whales annually. *Id.* at 223–34. Of these annual totals, NMFS attributes three to state trap/pot fisheries and 4.57 to federal trap/pot fisheries such as those operating in federal waters offshore Maine in the LMA 1 Restricted Area. *Id.*

In the proposed rule, NMFS clearly laid out why new and expanded seasonal restricted areas are necessary to meet the full risk reduction target. *See, e.g.*, 85 Fed. Reg. at 86,882 ("The purpose of these restricted areas would be to achieve risk reduction and reduce mortalities and serious injuries to below PBR when combined with the other proposed measures described in this rulemaking."). To identify offshore areas that could benefit from a restricted area, NMFS relied on recent and historical sightings data, acoustic monitoring data, prey distribution data, and buoy line density data. Record of Decision (ROD at 22) (Ex. 2 to Fed. Defs.' Br.).

NMFS identified the LMA 1 Restricted Area, 967 square miles in federal waters 30 miles offshore Maine, as an area of significance in the Gulf of Maine. This is a seasonal hotspot for right whales at a time when there is also a high density of stronger, longer vertical buoy lines, thus posing the greatest risk to whales. FEIS at 78, 80–82. The LMA 1 Restricted Area protects right whales that are foraging or transiting. *Cf.* Pls.' Br. at 2. The entire Gulf of Maine was

designated as right whale critical habitat in 2016 specifically because of its importance as

foraging habitat. 81 Fed. Reg. 4,838 (Jan. 27, 2016). Although the data analyzed for the FEIS

indicate that right whales may have foraged there less in the last few years than in prior years,[3]

this does not negate the importance of the LMA1 Restricted Area, given the high density of

heavy lobster gear when whales are present in highest abundance. As the ROD states:

> Given the data we already had on predicted whale density in this area according to the new 2010 to 2018 model provided by Duke (in [Maine lobster management] zones C, D, and E), the estimated buoy line density, the associated risk reduction in the updated Decision Support Tool, and supplementary acoustic data, NMFS determined that this area was still an important area for spatial management in the Northeast region.

ROD at 22. NMFS considered relevant factors related to both the geographic size and seasonality

of the closure, stating:

> Zone E is still showing up as a hotspot during all months of the closure. Decreasing the size of the restricted area could likely push additional lines into the hot spot in Zone E, potentially increasing the risk of entanglement in this area during this time period. Furthermore, smaller areas are less resilient to changing whale distributions so reducing the size will likely reduce the effectiveness of the closure.

*Id*. The agency's hotspot analysis demonstrates that between October 1 and January 30, right

whales will receive the most risk reduction. FEIS at 81–82. NMFS expects the closure to provide

6.6% of the risk reduction in the Final Rule, ROD at 21, and to ensure the sufficiency of Maine's

overall contribution to risk reduction. 86 Fed. Reg. at 51,996–97.

The rulemaking concluded on September 17, 2021. 86 Fed. Reg. 51,970. The regulations

establishing new and expanded restricted areas take effect on October 18, 2021. *Id.*

## ARGUMENT

**I.       Standard of Review for Preliminary Injunction**

Injunctive relief is "an extraordinary and drastic remedy that is never awarded as of

---

[3] During this time, survey effort decreased in the Gulf of Maine, resulting in potentially biased data. *See* FEIS at 81.

right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted). This Court recently reiterated the four factors necessary for a court to grant such relief: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Bayley's Campground Inc. v. Mills*, 463 F. Supp. 3d 22, 29 (D. Me. 2020). As "the party seeking injunctive relief, Plaintiffs bear the burden of establishing that the factors weigh in their favor." *Id.* (*citing Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117, 119–20 (1st Cir. 2011)).

## II.     Plaintiffs Fail to Meet Their Burden to Show Likelihood of Success on the Merits

The Administrative Procedure Act (APA) provides the standard of review for evaluating Plaintiffs' likelihood of success on the merits. Under this standard, the Court must uphold the agency's decision unless Plaintiffs can demonstrate NMFS's decision was arbitrary and capricious. *City of Taunton v. EPA*, 895 F.3d 120, 126 (1st Cir. 2018). This is a deferential standard of review and "[h]ere, the 'scientific and technical nature of [NMFS's] decisionmaking' increases [the Court's] level of deference." *Id.* Plaintiffs' various arguments challenging NMFS's decision to implement the LMA 1 Restricted Area, Pls.' Br. 6–18, "amount to nothing more than competing views about policy and science, on which . . . [courts] defer to the agency." *In re Polar Bear*, 709 F.3d 1, 9 (D.C. Cir. 2013) (citation omitted).

### A.     The LMA 1 Restricted Area Is Consistent with the Purpose of the MMPA and Based on the Best Available Science

The LMA 1 Restricted Area is both consistent with the MMPA and based on the best available science. Plaintiffs' contrary arguments rest on a mischaracterization of the MMPA and their mistaken belief that NMFS may only act based on absolute scientific certainty. As courts have recognized, "[s]cientific findings in [the] marine mammal conservation area are often

7

necessarily made from incomplete or imperfect information." *Brower v. Evans*, 257 F.3d 1058, 1070 (9th Cir. 2001). That is why, in making decisions regarding endangered right whales, Congress required NMFS to rely on the best *available* scientific information. *See, e.g.*, 16 U.S.C. §§ 1386(a), 1536(a)(2). "[T]he 'best scientific . . . data available," does not mean 'the best scientific data possible.'" *San Luis & Delta-Menota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (citation omitted). In other words, "[e]ven if the available scientific and commercial data were quite inconclusive, [the agency] may—indeed must—still rely on it." *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000).

First, Plaintiffs argue that NMFS's decision to implement the LMA 1 Restricted Area does not meet the MMPA's "salutary" purpose of protecting marine mammals' essential habitats. Pls.' Br. 6–9. But they ignore that one of the MMPA's purposes is to protect and recover marine mammal populations. 16 U.S.C. § 1361(6). The statute's moratorium on all unauthorized take of individual animals, *id*. §§ 1371(a), 1372(a), applies no matter the relative importance of the habitat in which take may occur. And section 118 imposes a mandatory duty on NMFS to bring right whale mortalities and serious injuries in the lobster fishery to below PBR. NMFS acted in accordance with the MMPA and with the best available science in establishing the LMA 1 Restricted Area in pursuit of this mandatory goal.

Second, Plaintiffs wrongly assert that, to justify the LMA 1 closure, NMFS was required to establish a "causal link" between right whale entanglements and vertical lines fished there. Pls.' Br. at 6–7 (citation omitted).[4] But NMFS's highly technical evaluation of the best available scientific data, reviewed under the APA's narrow and deferential standard, cannot be set aside simply because there is uncertainty in the data.

---

[4] Plaintiffs' cited case, Pls.' Br. at 7, concerned the evidentiary standard for proving a violation of ESA section 9 and does not supply the correct standard of review here.

While the right whale is probably the most studied large whale in the world, no one knows where most of them are most of the time. 86 Fed. Reg. at 51,976. Most right whale mortalities are never detected, *id.*, including those caused by entanglements. 86 Fed. Reg. at 3036. Gear is neither present on all documented entanglements nor retrievable from nearly half of such entanglements. 86 Fed. Reg. at 51,976. Only a fraction of retrieved gear can be traced to a country of origin (U.S. or Canada), let alone a particular area within that country. *Id.*; *see also id.* at 51,981, 51,922. The inability to link a right whale entanglement to a particular fishery stems in no small part from decades-long fishing industry opposition to a comprehensive gear marking scheme and a corresponding failure by federal and state regulators to require one. *E.g.*, 64 Fed. Reg. 7529, 7533 (Feb. 16, 1999) (eliminating most gear marking requirements from 1997 interim final Plan); 65 Fed. Reg. 80,368, 80,373–74 (Dec. 21, 2000). As a result, "[o]ut of approximately 1.24 million buoy lines within the Northeast waters from Rhode Island to Maine," an estimated "72 percent of buoy lines were unmarked under current [Plan] guidelines[.]" 86 Fed. Reg. at 51,981. Until September 2020, Maine had never required gear markings on lobster trap buoy lines in most of its waters. *Id.*; *see also* 86 Fed. Reg. at 3035–36.

Plaintiffs assert that the average diameter of "lines used in Maine waters" is "scientific evidence" demonstrating that lobster fishing in LMA 1 is not a risk to right whales. Pls.' Br. at 7. NMFS has already rejected this argument. 86 Fed. Reg. at 3,036 ("[U]nless a rope diameter is specifically prohibited in an area, rope diameter does not rule out the potential for an entanglement to have occurred in Maine waters, even if it does not represent the majority's normal fishing practices."); *see also* 86 Fed. Reg. at 51,992–93 (observing that anchored minke whales and humpback whales have been identified in Maine gear in the last 15 years, demonstrating that "Maine lobster buoy lines entangle and kill whales"). Moreover, NMFS

9

specifically determined that the LMA 1 Restricted Area is a hotspot not only because of greater

whale density and gear density but also because of the riskier, heavier gear used in the offshore

area as compared to gear in nearshore areas. 86 Fed. Reg. at 51,998; *see also* FEIS at 80–81.

Plaintiffs insist that lobster fishing in the LMA 1 Restricted Area poses no risk to right

whales because climate change has shifted the whale's distribution. Pls.' Br. at 7–8. While there

is uncertainty regarding whale distribution, entanglements, and buoy line numbers, NMFS

developed a model it considers "to be the best available analytical tool to assess the co-occurring

risk of large whale entanglement in commercial fixed gear" using "data from nearly every

systematic marine mammal survey of the eastern United States" and "every available state and

federal fisheries data source." 86 Fed. Reg. at 51,993. NMFS relied on this model to determine

that the LMA 1 Restricted Area is necessary. Even after updating its whale density model to

account for the habitat shift starting in 2010, NMFS found that the model continues to predict

both higher whale densities in the restricted area relative to other areas and higher entanglement

risk from the density of lobster lines. 86 Fed. Reg. at 51,996–97; FEIS at 40, 80–82, 201–02. In

the absence of systematic survey data, NMFS verified the model's predictions with acoustic data

demonstrating the species' continued use of LMA 1. 86 Fed. Reg. at 51,997. Despite the right

whale's distribution shift, NMFS has determined that right whales still occur in waters offshore

Maine and throughout the Gulf of Maine at various times of the year. *Id.* at 51,994. Because

NMFS "lack[s] information on exactly where interactions occur," it was well within the agency's

latitude for professional scientific judgment to "use areas of high co-occurrence of right whales

and fishing gear as a proxy for identifying areas of high entanglement potential." *Id.* at 51,992.

Plaintiffs cannot succeed on their argument that NMFS violated the MMPA in deciding

to spread the burden of risk reduction across jurisdictions or to implement measures that might

10

exceed a 60 percent risk reduction target. Pls.' Br. at 8–9. Nothing in the MMPA forbids such an

outcome, especially considering NMFS's reasonable, science-based assessment of this particular

LMA 1 co-occurrence hot spot and its determination that "Maine has the highest concentration of

all vertical line gear in U.S. waters, and right whales are still using Maine waters," 86 Fed. Reg.

at 51,981. Moreover, NMFS decided to spread risk reduction across the Northeast region "to

remain resilient to changes in right whale distribution." *Id.* at 51,992.

      Plaintiffs' challenge to NMFS's decision to apportion 50 percent of entanglements of

unknown origin to the U.S. and 50 percent to Canada, claiming that the agency ignored the far

greater dangers posed by entanglements in Canadian waters, Pls.' Br. at 10–11, likewise fails. In

the BiOp, FEIS, and Final Rule, NMFS grappled with the best available data on entanglements

of unknown origin and explained why it landed on the 50/50 split. *See* BiOp at 216–17; FEIS at

55–57. Certainly, NMFS was not free to ignore available data that most entanglements are never

assigned to a country of origin and simply blame Canada by assigning it double to quadruple the

entanglement risk as Plaintiffs seem to suggest. Pls.' Br. at 11. Rather, comparing gear types

used on both sides of the border, NMFS found that although

> [i]t is clear from recent documented M/SI incidents where gear has been present
> that heavier [Canadian] snow crab gear poses a greater mortality risk than buoy
> lines associated with most nearshore lobster fisheries . . . given the large number of
> lines in U.S. waters including larger diameter lines and . . . configurations in
> offshore U.S. fisheries, significant risk occurs on both sides of the border.

BiOp at 217. *See also* 86 Fed. Reg. at 51,971 (explaining reasoning for apportionment given an

average of four mortality and serious injuries a year that cannot be attributed to either country);

*id.* at 51,976–77 (responses to comments); FEIS at 55–57. In fact, NMFS relied on the data on

the right whale's distribution shift since 2010 to apportion *a higher entanglement risk percentage*

to Canada than its own guidance document would otherwise have specified. BiOp at 216–17; 86

11

Fed. Reg. at 51,976 (explaining that "the entire [right whale] population could be present in U.S. waters from December through April and up to two thirds of them could be present year round" and that "U.S. fisheries fish many more buoy lines than Canadian fisheries.").

Plaintiffs also challenge NMFS's assumption that lobster trap/pot gear, rather than gillnets or non-lobster vertical and ground lines, cause all unknown entanglements resulting in mortality and serious injury in U.S. waters. Pls.' Br. at 11–12. But NMFS clearly explained why its analysis of recovered gear as well as the sheer number of vertical lines the lobster industry fishes makes this assumption reasonable. BiOp at 217–19; 86 Fed. Reg. at 51,989, 51,993; *see also* 86 Fed. Reg. at 3,036. Plaintiffs do not point to contrary data that the agency ignored.

Plaintiffs' arguments on uncertain sources of mortality do not bear scrutiny. Taylor et al. (2012) (Ex. 2), *see* Pls.' Br. at 12–13, analyzes shark attacks on four calves. It does not undermine NMFS's conclusion that only calves die of natural causes, while adult whales are killed by vessel strikes or entanglements. BiOp at 221; *see also* FEIS at 83–84, 219–220. NMFS also explained why other potential stressors are beyond the scope of the rulemaking. 86 Fed. Reg. at 52,000–02.

Plaintiffs are wrong that NMFS simply pointed to substantial scientific uncertainty to justify its action. *See* Pls.' Br. at 13–15. Rather, NMFS directly confronted the uncertainty in the data and explained why its action is necessary in the face of that uncertainty. *Cf.*, Pls.' Br. at 15. Plaintiffs' argument that the Team did not specifically suggest the LMA 1 Restricted Area is irrelevant. *See* Pls.' Br. at 15. While the Team is an advisory body, "it is ultimately NMFS' responsibility to meet the mandates of the MMPA." ROD at 24.  In establishing the LMA 1 Restricted Area, NMFS explained that while the Team's Maine caucus originally endorsed measures to achieve the necessary risk reduction via a 50 percent line reduction, it subsequently

12

withdrew its support for such measures and instead proposed alternatives that would not sufficiently reduce risk. 86 Fed. Reg. at 51,996–97. Therefore, NMFS determined the LMA 1 Restricted Area is necessary to reduce entanglement risk to right whales to the requisite level. *Id.*

Equally unavailing is Plaintiffs' contention that NMFS's 60 percent risk reduction target is arbitrary because it accounts for undetected mortalities. Pls.' Br. at 15. Plaintiffs point to a statement that the models "cannot distinguish between true mortality and the appearance of mortality that would come from an individual permanently leaving the survey areas." 86 Fed. Reg. at 51,993. However, Plaintiffs ignore the remainder of that paragraph:

> For that to happen in great abundance would suggest that many whales use the United States and Canadian coasts for enough time to become catalogued and then decide to move elsewhere and never return. There is simply no evidence for that scenario. Indeed, there is abundant evidence that the [whale's] great mobility allows them to . . . return to the survey areas to be "recaptured[.]"

*Id.* Moreover, in developing the Final Rule, NMFS ultimately chose a risk reduction target based on *observed* mortality and serious injury. 86 Fed. Reg. at 51,983 (the Final Rule will "reduce right whale mortality and serious injury in U.S. commercial fisheries, from an observed annual average of 2.2 to a PBR of less than one whale per year.").

B.   NMFS Gave Due Consideration to Alternatives

Contrary to Plaintiffs' assertions, Pls.' Br. at 18–21, NMFS evaluated various alternatives to the measures ultimately included in the Final Rule. *See, e.g.*, FEIS at 6–9, 117–122 (charts listing alternatives considered). This includes the two alternatives that Plaintiffs claim NMFS failed to consider—a different restricted area overlapping LMA 1 and LMA 3 and a dynamic restricted area. *See id.* at 118; FEIS Vol. II at 44. Plaintiffs' complaints stem not from NMFS's failure to consider Plaintiffs' preferred alternatives but from its reasonable choice to reject them. This cannot serve as the basis to hold the LMA 1 Restricted Area unlawful. *See, e.g.*,

*Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008) (courts cannot "direct the agency in a choice between rational alternatives" involving technical science).

First, NMFS considered and rejected an alternative that would have implemented a different restricted area with boundaries overlapping both LMA 1 and LMA 3. As it explained, "[g]ear density on the LMA 3 side is much lower than on the LMA 1 side." 86 Fed. Reg. at 51,998. NMFS "initially assessed a restricted area that included both sides of the boundary[] but determined that there was minimal benefit from the LMA 3 side." *Id.* It also explained that "LMA 3 vessels are adopting trawling up and weak line measures that provide greater risk reduction, so the restricted area does not include the LMA 3 side of the boundary." *Id.*

Second, NMFS considered and rejected a dynamic restricted area. It explained that the Plan previously had a dynamic management program that was ultimately eliminated based in part on "significant complaints" from fishermen that they "could not safely remove or modify their gear in time." 86 Fed. Reg. at 51,995. Seasonal measures are also preferable for conservation as "gear cannot be removed instantaneously, and factors such as weather and sea conditions affect the timing of gear removal," such that dynamic closures might not reduce risk in practice. *Id.* at 51,985.

Plaintiffs point to the fact that the prior biological opinion for the lobster fishery "included triggers for reinitiation [of ESA consultation] if anticipated levels of entanglement are exceeded." Pls.' Br. at 20 (citation omitted). But reinitiation of consultation in such circumstances is expressly required under the ESA. 50 C.F.R. § 402.16(a). This requirement provides important protections to endangered species by providing a safeguard against the agency's original decision that incidental take of a listed species from a proposed action will not jeopardize its continued existence. *Ctr. for Biological Diversity v. Bernhardt*, 928 F.3d 723, 748–

14

50 (9th Cir. 2020). The prior biological opinion's reinitiation trigger is not an example of NMFS implementing dynamic restricted areas.

Equally unavailing is Plaintiffs' suggestion that because Canada has dynamic measures to mitigate right whale entanglement risk, NMFS's decision not to implement them for the U.S. lobster fishery must be unreasonable. Pls.' Br. at 20. NMFS explained that the regulatory landscape in Canada is much more agile than in the U.S., enabling Canada to implement dynamic measures faster and more easily. 86 Fed. Reg. at 51,995.

## III.  Plaintiffs Fail to Satisfy Their Burden to Demonstrate Irreparable Harm

Plaintiffs fail to demonstrate irreparable harm. To obtain an injunction, Plaintiffs "must show that they themselves are likely to suffer irreparable harm absent an injunction." *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 822 (9th Cir. 2018) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). "A plaintiff cannot satisfy this requirement by showing only that, in the absence of relief, a third party will be harmed." *Courtland Co. v. Union Carbide Corp*., No. 2:21-cv-00101, 2021 U.S. Dist. LEXIS 65819, at *73–74 (S.D.W.V. Apr. 5, 2021).

Here, Plaintiffs have presented *no evidence* of how they themselves will be harmed by the LMA 1 Restricted Area between now and this Court's merits decision. Plaintiffs do not submit a single declaration from *any* individual plaintiff or member; most notably, Plaintiffs do not submit a declaration from any of the 123 fishermen that may be affected by the closure of the LMA 1 Restricted Area from October 2021 to January 2022. FEIS at 271–72, 286–87. Instead, they rely on a state official's declaration that provides no evidence of irreparable harm to Plaintiffs' interests. *See* ECF No. 10-1. The declarant merely states that he was "aware" of proposed regulatory actions and that he "participated" in meetings and dialogue with the "Maine lobstering community" among others. *Id.* ¶¶ 3–5. Plaintiffs' only other submission—a 2018

15

economic report on the distribution of lobster in Maine—similarly fails to demonstrate how Plaintiffs will be irreparably harmed pending resolution of this case. *See* ECF No. 10-2.

Rather than submitting the necessary evidence, Plaintiffs make repeated but unsubstantiated claims about how the LMA 1 Restricted Area will supposedly affect the entire Maine lobster industry—and the state—as a whole. *See, e.g.*, Pls.' Br. at 21 ("the industry at large, and the entire State of Maine will suffer irreparable harm if the Court does not restrain the LMA1 Restricted Area."); *see also id.* at 22 (referring to impacts on "Maine's coastal communities"). But Plaintiffs cannot demonstrate irreparable harm based on "[s]peculation or unsubstantiated fears of what may happen in the future." *In re Rare Coin Galleries, Inc*., 862 F.2d 896, 902 (1st Cir. 1988). Nor can Plaintiffs demonstrate irreparable harm by alleging impacts to third parties, including the community at large. *See, e.g.*, *Holly Sugar Corp. v. Goshen Cty. Co-op. Beet Growers Ass'n*, 725 F.2d 564, 570 (10th Cir. 1984). And the relevant inquiry is not the effects of the LMA 1 Restricted Area in perpetuity, but only until this case concludes.[5]

Plaintiffs fail to adduce any evidence that the LMA 1 Restricted Area will cause the kind of widespread economic harm that Plaintiffs claim during the pendency of the litigation. To the contrary, the available evidence demonstrates that the Restricted Area will affect only a small number of fishermen in an area that poses a "higher than average risk" to right whales. FEIS at 81. Specifically, the LMA 1 Restricted Area will affect only 123 fishermen out of the 4,800 commercial fishermen Maine says are licensed to fish off Maine. *See* ECF No. 1-3 at 4.

Moreover, the total size of the LMA 1 Restricted Area—967 square miles—is a relatively small portion of the entirety of LMA 1, which stretches from Massachusetts to Canada. *See* FEIS

---

[5] Plaintiffs wrongly assert that "[c]ourts uniformly have found that the closure of lobster grounds will result in irreparable harm to fishermen and local communities." Pls.' Br. at 22. In two of those cases, the plaintiff sought to shut down *all* fishing with buoy lines in state waters, whereas the LMA 1 Restricted Area affects only 123 vessels.

at 373. Further, contrary to Plaintiffs' assertion that the Restricted Area "will act as a permanent closure because virtually all fishermen *only* harvest its waters between October and January," Pls.' Br. at 1, record evidence demonstrates there are tens of thousands of lines in the water in LMA 1 off Maine in all months of the year. FEIS at 114.

### III.     The Balance of Equities and Public Interest Strongly Disfavor an Injunction

Plaintiffs must also show that "a balance of equities in [its] favor" and the public interest support granting the requested injunction. *Bayley's Campground*, 463 F. Supp. 3d at 37 (citations and quotation marks omitted). These factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted).

Plaintiffs' request is directly contrary to the public interest. Plaintiffs seek to prevent an important conservation measure for critically endangered right whales from taking effect, thereby increasing the risk these whales will become entangled, injured, and killed in lobster gear in a high-risk area. "Both lethal and sublethal effects of entanglement bring the species ever closer to extinction, from which there is, of course, no return." *Conserv. Law Found. v. Ross*, 422 F. Supp. 3d 12, 34 (D.D.C. 2019). As the First Circuit emphasized in another case involving the entanglement of right whales in commercial fishing gear, "the balancing and public interest prongs have been answered by Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species." *Strahan v. Coxe*, 127 F.3d 155, 160 (1st Cir. 1997) (citation and quotation marks omitted); *see also id.* at 171 (same); *Kokechik*, 839 F.2d 800, 802 (concluding that, under the MMPA, "[t]he interest in maintaining healthy

populations of marine mammals comes first" and the statute must "be administered for the benefit of the protected species rather than for the benefit of commercial exploitation."). Numerous courts have recognized that the public has an "extremely strong" interest in protecting "the survival and flourishing of marine mammals and endangered species[.]" *NRDC v. Evans*, 364 F. Supp. 2d 1083, 1141 (N.D. Cal. 2003); *see also Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 983 (D. Haw. 2008) (same). In short, Plaintiffs' unsubstantiated allegations of economic harm cannot trump the "incalculable" value of the survival of the critically endangered—and ever-dwindling—right whale. *See TVA v. Hill*, 437 U.S. at 187–88.

That is particularly true here, where the species desperately needs the protections that the LMA 1 Restricted Area provides. NMFS has termed the right whale's situation as "an urgent conservation crisis." NMFS, Immediate Action Needed to Save North Atlantic Right Whales (July 3, 2019) (Ex. 3). The population, numbering fewer than 360 whales, has been suffering a sharp decline for at least a decade. *See* FEIS at 1; ROD at 1. NMFS has concluded the species' "survival . . . depends on no more than one whale death per year." NMFS, 10 Things You Should Know About North Atlantic Right Whales (Oct. 17, 2019) (Ex. 4). The agency has determined that the right whale's extinction is almost certain in the immediate future if existing threats are not dramatically reduced; it considers protecting the whales from entanglement in fishing gear as the number one priority for saving the species. NMFS, Species in the Spotlight Priority Actions 2021–2025: North Atlantic Right Whale at 1, 4 (March 2021) (Ex. 5). Scientists have found that the most effective way to reduce the risk of entanglement and ensure the species' recovery is to remove vertical line from the water column. Moore et al. 2021 at 212 (Ex. 6).[6]

Confronted with this reality, Plaintiffs claim that the public also has an interest in the

---

[6] Hundreds of thousands of people submitted comments to NMFS supporting increased protections for right whales from entanglements, *see* 86 Fed. Reg. at 51,975, further affirming the public interest in conserving the species.

"continued survival of the American lobster fishery" Pls.' Br. at 26; *see also id.* at 25. However, as explained above, the survival of the fishery is not at issue in this case; Plaintiffs' unsubstantiated, exaggerated claims cannot substitute for their unmet burden to prove the irreparable harm they themselves will suffer. *See supra* pp. 15–17.

Conversely, the Restricted Area "provides significant risk reduction for right whales." 86 Fed. Reg. at 51,997. As explained above, NMFS found based on the best available science that implementing the LMA 1 Restricted Area is necessary to achieve the risk reduction target that the MMPA requires. NMFS reached this determination based on an examination of the "best available information, including recent and historical right whale and other large whale sightings data, acoustic monitoring data, and data on prey distribution." ROD at 22. Plaintiffs' suggestion that implementing the LMA 1 Restricted Area is unnecessary because NMFS determined it will reduce risk by "only 6.6%" of the Final Rule's overall level of risk reduction Pls.' Br. at 25, ignores the fact that "[i]ndividual risk reduction associated with one measure is not as accurate as the combined risk reduction of measures implemented together because it does not account for changes in line numbers or distribution associated with other measures nearby." ROD at 21.

Plaintiffs also mistakenly claim that an injunction will serve the public interest because it "will finally force the agency to evaluate the effectiveness of mitigation measures" implemented under the Plan. Pls' Br. at 26. An injunction will do no such thing. Granting Plaintiffs' injunction will prevent a measure that provides vital protections to right whales from taking effect. It will not require NMFS to do any analysis. Indeed, Plaintiffs argue that they are not seeking a mandatory injunction. *Id.* at 24–25. Moreover, NMFS already determined the Final Rule, including the LMA 1 Restricted Area, is necessary precisely because the Plan has not been effective and urgently needed to be amended to fulfill the MMPA's mandatory goals. *See, e.g.*,

FEIS at 43 ("[g]iven the level of mortality and serious injury of right whales documented and estimated since 2010 combined with low reproductive rates, it has become more urgent to ensure that mortality and serious injury caused by incidental entanglements in U.S. commercial fisheries be reduced below PBR."); NMFS, Tech Memo 2018 at 8 (Ex. 5 to Fed. Defs.' Br.) (despite several Plan amendments, including in 2009 and 2015, data from 2000 through 2017 showed that "absolute entanglements appear to be on the rise.").

In sum, Plaintiffs have failed to show a likelihood of success on the merits; have failed to adduce evidence demonstrating the irreparable harm that they themselves—not the entire Maine lobster industry—will allegedly suffer from the LMA 1 Restricted Area during the pendency of this litigation; and have failed to show that the public interest and balance of the equities favor enjoining a critically important conservation measure for the critically endangered right whale.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Respectfully submitted this 12th day of October, 2021.


/s/ Erica Fuller
Erica A. Fuller*
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
(617) 850-1754
efuller@clf.org


/s/ Emily Green
Emily K. Green, Bar No. 005095
Conservation Law Foundation
53 Exchange St., Suite 200
Portland, ME 04101
(207) 210-6439
egreen@clf.org

/s/ Kristen Monsell
Kristen Monsell*
Center for Biological Diversity
1212 Broadway, Ste. 800
Oakland, CA 94612
(510) 844-7137
kmonsell@biologicaldiversity.org


/s/ Jane P. Davenport
Jane P. Davenport*
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 722-3274
jdavenport@defenders.org

*Admitted pro hac vice
*Counsel for Intervenor-Defendants*

20